## CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF MARYLAND v. PUBLIC SERVICE COMMISSION OF MARYLAND et al.

[No. 97, September Term, 1962.]

*Decided January 17, 1963.*

The cause was argued before HENDERSON, HAMMOND, HORNEY, MARBURY and SYBERT, JJ.

*Richard W. Case,* with whom were *Clifford Davis, Jr., Edward O. Clarke, Jr., Roger D. Redden* and *Smith, Somerville & Case* on the briefs for appellants.

*Francis X. Gallagher, People's Counsel,* with whom were *Rudolph A. Carrico, General Counsel* and *William J. Torrington* on the brief for Public Service Commission, part of appellees.

*David L. Rose,* with whom were *John G. Laughlin, Attorney, Department of Justice, Joseph D. Guilfoyle, Acting Assistant Attorney General,* and *Joseph D. Tydings, U. S. Attorney,* on the brief, for United States, part of appellees.

*L. A. Scholz,* for intervenor, other appellee.

HAMMOND, J., delivered the opinion of the Court.

Chesapeake and Potomac Telephone Company of Maryland seeks to reverse the order of court which affirmed the determination of the Public Service Commission that (a) the fair value of the Company's assets used and useful in rendering intrastate service to the public, as of December 31, 1960, was the value the Commission had determined in the previous rate case in 1958, plus net additions in the interval, and (b) the Company needed increases in rates calculated to produce an income of 6.3% of the amount of the rate base.

The Commission's action gave the Company less income than it sought, but it does not presently challenge the end result. Rather, it says that there was error because, in arriving at fair value, the Commission gave no weight to the testimony of the current monetary measure of its property. It seeks to have the case returned to the Commission with directions to give the Company's evidence of fair value proper (although unspecified) weight. The Company has a subsidiary complaint that the Commission, in calculating net operating income for rate making purposes, erred by disallowing two deductions claimed as operating expenses. It refused to give full credit for federal income tax paid by the Company since the amount paid was greater than the Company's proportionate share of the total tax payable under a consolidated return filed by its parent corporation, American Telephone and Telegraph Company, and the Company and other subsidiaries; and it disallowed charitable contributions made by the Company.

On February 11, 1958, the Commission filed its opinion and order in Case No. 5537 (the predecessor case to that now under review), allowing the Company to charge rates which would result in an increase of not more than $6,048,900 in gross annual revenues. On April 8, 1959, the People's Counsel, alleging that the Company's income was producing a return larger than that authorized by the order, filed a petition asking the Commission to reopen the 1958 case to determine the excess income, and to order refunds and set a revised schedule of rates. Perhaps on the theory that the best defense is a good offense, the Company, two days later, filed a petition asking the Commission to determine the earnings necessary to provide a reasonable return on the fair value of its property. As a result, the Commission ordered that the requested investigation be instituted in Case No. 5625, the instant proceeding, and made the petition of the People's Counsel and that of the Company a part of those proceedings. On February 25, 1960, the Commission dismissed the petition of the People's Counsel to reopen Case No. 5537 (the 1958 case) and to require the refund of any excess income. At the Company's request formal hearings on its application for the fixing of its

rate base were not commenced until March 23, 1960. Almost thirteen months later, on April 6, 1961, the Commission, after hearing extensive expert testimony from both sides, set the Company's intrastate rate base at $321,185,305 as of December 31, 1960, and allowed a return thereon of 6.3%. There was authorized an amended schedule of rates which would produce an increase to the Company of not more than $458,000 in gross annual revenues.

The Company filed its appeal in the Circuit Court No. 2 of Baltimore City pursuant to then Maryland Rule 1101 (now Rule B), limiting the issues on appeal to whether the Commission erred (a) in its finding of fair value, (b) in reducing the amount of income tax to be allowed as an operating expense, and (c) in disallowing the amount paid out as charitable contributions. Judge Allen resolved all issues against the Company.

The testimony offered by the Company was that the fair value of its property used in rendering intrastate service (net plant, materials and supplies), as of May 31, 1960, was $338,885,965. The appraisals were predicated on the theory that the plant was built as it actually had been over the years at wage levels, labor productivity and other cost factors prevailing in 1958.

Several techniques were used. Book cost was applied to rights-of-way, plant under construction and property held for future use. Most of the land was appraised. The price trend index method was applied to buildings, central office equipment, large private branch exchanges and underground conduits. Station apparatus and station connections were priced direct. The predominant unit method was applied to the remaining property. The last three classes of property made up forty-five, seventeen, and thirty-six per cent, respectively (a total of ninety-eight per cent), of total value.

The Company's appraisal resulted from ten months' study by its experienced engineers and accountants, assisted by outstanding experts, some of whom testified. The Dean of the School of Engineering of the Johns Hopkins University testified that the calculations which produced the Company's

figures represented sound accounting, engineering and economic concepts and that the resulting figure indicated "conservative fair value."

The People's Counsel produced testimony from an accountant who had specialized in utility and regulatory commission procedures (he had long experience with the Public Utilities Commission of the District of Columbia and the Public Service Commission of Maryland, and had served as consultant to other Commissions). His testimony was that the fair value rate base should be "that figure which the Commission thinks is fair, after considering all of the evidence as to original cost, reproduction cost and any other matters having a bearing on the subject. It is purely a matter of Commission judgment. There is no formula that I am aware of with which to compute fair value." His estimate was that the fair value of the Company's property at December 31, 1960, was $292,481,788. He did not think the Company needed an increase in rates because "Every test shows the earnings to be more than generous. The securities of this Company are given the highest rating * * * [D]ividends have been increased so that the effects of inflation have been compensated for, as they affect the stockholders, which in this case is A. T. & T."

The United States, an intervenor, offered the testimony of a qualified economist that a fair and reasonable rate of return on a measurement of net book value would be 5.85%. The People's Counsel produced a recognized expert in the field of utility regulation, whose elaborate, painstaking and detailed analysis made him conclude that a return of from 6% to 6.25% on a rate base that was essentially determined from original cost less depreciation would be sound and proper to allow. This witness disagreed with the technical interpretation of statistics and data of the Dean of the Johns Hopkins School of Engineering and with his conclusions.

Code (1957), Art. 78, Secs. 68, 69 and 72, articulate what the decisions of this Court have previously determined. This is that the Commission in a rate case must fix "the fair value of the property of any public service company used and useful in rendering service to the public" and allow a just rate of

return thereon, that is to say, a return which will result in as much net operating income as will yield a reasonable return on the rate base fixed. *C. & P. Telephone Co. v. Public Service Commission*, 201 Md. 170; *Baltimore Transit Co. v. Public Service Commission*, 206 Md. 533; *Hagerstown v. Public Service Commission*, 217 Md. 101; *Baltimore Gas Co. v. McQuaid*, 220 Md. 373. Section 85 (a) requires that every decision and order of the Commission in any contested proceeding shall be in writing and shall state concisely the grounds for the Commission's conclusions. Section 97 provides that every final decision of the Commission prima facie shall be correct and shall be affirmed on appeal to the courts unless shown to be unconstitutional, or without statutory authority or made upon unlawful procedure, or arbitrary or capricious, or unsupported by substantial evidence on the record considered as a whole, or is affected by other error of law.

The Company contends that the Commission totally ignored the only evidence of current value in the record and relied on net original cost plus an increment value determined on a record made ten years before which, perhaps, was reasonable then but now was no more than the use of a rubber stamp, and that this makes the Commission's action unsupported by substantial evidence and affected by error of law.

A brief review of the prior rate cases in which the Company has been involved is necessary for a proper understanding and consideration of this contention. On March 16, 1950, the Commission decided a bitterly contested rate case (No. 4968) by finding a fair value of the Company's property to exceed its net original cost by $2,136,172. Less than fifteen months later, the Company filed a new rate application (No. 5176) which was tried largely upon the record made in the earlier case. After weighing all of the new evidence and considering the change in the economy which had taken place since its decision was rendered in No. 4968, the Commission in 1952 determined fair value by adding $3,060,139 to net original cost. The 1952 case came to this Court on appeal. The Company argued that the Commission had not given sufficient weight to the evidence of reproduction costs which had been

presented to the Commission. This Court affirmed the Commission and sustained its use of the $3,060,139 increment to net original cost in determining fair value. At pages 182-183 of 201 Md., we said:

"We come, then, to the heart of the question presented by the Company's appeal, whether the Commission failed to give to reproduction cost the consideration required by the concept of fair value * * *.

The Company argues that its estimate of reproduction cost was conservative and designed to meet the objections raised in the prior hearings. * * *

Estimates of reproduction costs are conjectural at best, not merely because they rest on opinion, but for the obvious reason that probably no plant would ever be reproduced in its present form. Even the physical structures to replace the old would be designed, so far as possible, to compensate in efficiency and convenience for the higher construction costs. * * * In regard to plant equipment, the increased cost of reproduction would likewise be measurably offset by the technological improvements constantly discovered and introduced to meet the rising costs of labor and materials. One result is that equipment becomes obsolete before it wears out. * * *

There can be no doubt that the Commission took these factors into account. In its earlier opinion, reaffirmed in the opinion filed in 1951, it said:

'* * * In short, it is a theoretical reproduction of something which, as a practical matter if it did not exist, would not be produced in its present form and locations. As this highly theoretical process has questionable probative value in times of normal and stable economy, it has even less value at the present time. * * *

'As heretofore mentioned, the Company is engaged in a major transition from manual to dial equipment. * * * These enormous changes strongly indicate that

there would be very little reality involved in undertaking to determine value from an estimate of the current cost of reproducing the entire plant.' "

This Court went on to find the record did not justify the conclusion that the Commission had failed to give proper consideration to the evidence of reproduction costs.

In the 1952 proceeding, historical cost less depreciation showed a value for the Company's intrastate plant of approximately $115,000,000 the Company's evidence that it was approximately $145,000,000, or 26% above historical cost, and the Commission found fair value to be some $118,000,000, which was $3,060,139, or 2.7% above historical cost. After this Court had affirmed the Commission's action, a new application was made by the Company in 1953.[1] The Commission then found fair value by taking the fair value found in the previous year (which included $3,060,139 above net historical cost) and adding to it the net investment in plant in the interim. Similarly, in 1954,[2] the Company agreed by stipulation to accept as the fair value of its property the value determined by the Commission in 1953 plus the book value of net additions.

In 1958, the Company, again seeking an increase in income, offered evidence based upon a reproduction appraisal that the fair value of its plant was some $43,000,000 (or 17.67%) above the book value shown by the Company's records. The Commission found fair value to be $3,060,139 above book value.[3] Thus the same method and procedure has been followed in 1952, 1953, 1954 and 1958, in that fair value has been determined to be net book value plus an increment of $3,060,139. The Company acquiesced in the determinations of fair value made in 1953, 1954, and 1958.

The Company says now that this Court in 1952 justified the Commission's use of $3,060,139 as an increment to net book cost by deciding that the Commission had exercised its discretion to give some weight to reproduction cost, but that in

1. Case No. 5257, 97 PUR (NS) 97, 100
2. Case No. 5328, 5 PUR 3d 161, 166
3. Case No. 5537, 22 PUR 3d 321, 328-330

the present case there is nothing to show why the same figure of $3,060,139 was used and that this indicates that no weight was given by the Commission to any evidence of value except original cost. It says that what was a judgment figure ten years ago in the 1952 proceeding today amounts to no more than an effort by the Commission to impose an original cost basis upon the Company contrary to the requirements of the statutes that fair value must be determined by the consideration and weighing of all relevant factors.

We do not agree with the Company's contention. In determining fair value the Commission is not bound to accept any one factor or method, or any particular combination of these or to accept any particular kind of evidence. Its finding of fair value must only reflect "the reasonable judgment of the Commission, based on all relevant facts of which several only, or indeed but one, may prove to be controlling," as was said at page 547 of 206 Md. in *Baltimore Transit Co. v. Public Service Commission, supra.* The Commission in the present case did acknowledge the evidence of the Company as to the value of its property in present day dollars, as is shown by its actions in adding an increment to net book value and in increasing the rate base by using the end of the year as a test point. It chose to give no greater weight than it did to the Company appraisal of current value for the reasons which impelled it to largely reject similar testimony in 1952, an action which this Court found justified. In its opinion in the present case, the Commission said that the use of a predominantly net original cost base gave a factually determinable constant and necessitated but one variable, the proper rate of return, but if a rate base were determined by "current appraisal" or "reproduction cost" or "trended cost" which change with the impact of recessions, booms, deflation or inflation or other economic trends, two variables would be involved. The Commission went on to say that in 1958 in Case No. 5537 the Company sought to have its rate base increased by giving evidence of cost indices indicating a current value derived from "trended original cost." The Commission then quoted its reasons for largely rejecting that evidence in the 1958 case as follows:

"In our opinion the determination of a rate base arrived at by the use of either 'trended costs' or 'reproduction costs' would, in today's economy, allow the company to reap a return on dollars never invested in plant and would require customers to pay for dollars never spent. In a reverse situation, with prices and cost declining, it could be argued that it would be equally unfair to Company to use either of these methods to establish a rate base, the result of which would be to deny the Company a return on dollars actually invested in plant. In point of fact the Company itself most vigorously opposed the use of price indices by the Commission when, some years ago, in a period of falling prices, the Commission attempted to arrive at a rate base by the trending method. The matter went to the Supreme Court of the United States and the position of the Company was sustained by the Court (295 U. S. 622) Vol. XLIX, 1958, P.S.C. of Md. Report, p. 42."

It then went on to say it had in various applications of various utilities consistently sought to offset adverse inflationary effects by its determination of a proper rate of return and by using a terminal, or year end, rate base, and that it would do so in the instant case. The Commission then concluded its views on a fair rate base in the present case by saying:

"Upon consideration of all of the evidence presented in this case we must find that the use of the rate base formerly used by the Commission in its determination of rates for this Company have produced results that have been fair and adequate insofar as the Company and its investors are concerned, and, if the results have been fair and adequate we assume that the means by which these results were accomplished were proper and reasonable. Having produced these results by the use of an original cost terminal rate base, plus the $3.060,139 increment added in 1951, it is our

opinion that such a base, represents the 'fair value' of Company's property for rate making purposes."

The opinion of the Commission shows it gave consideration to the Company's evidence of fair value by its discussion of the weaknesses of such evidence, its statement that there had been reliance on consideration of *all* the evidence in arriving at fair value and by the inferences drawn in it that previous similar rejections in large part of similar testimony had produced fair and reasonable results.

The fact that the Commission gave the same dollar weight to the Company's evidence of value—by again adding $3,060,-139 to net original cost—does not show that consideration and judgment had not preceded the use of this amount. It is scarcely arguable that actual original cost, less depreciation, is not the best evidence of the fair value of newly constructed plant and equipment, and for such new property reproduction cost (or "current appraisal") and book value tend to coincide. The Company has spent very large amounts in additions to its plant and equipment over the past ten years, and the proportion of new property and equipment in relation to the total thereof has constantly increased. In the 1952 case, the net "reproduction cost" of plant exceeded net original cost by over 26%, while in this case "current appraisal" exceeds net original cost by only 13%.

The increment of $3,060,139 is a substantially and significantly greater proportion of the difference between 1960 net original cost and 1960 current appraisal than it was between 1952 net original cost and 1952 reproduction cost. Further, the Commission not only added to the 1960 net original cost this presently more significant allowance of $3,060,139 for inflation but, by using a year end rate base, added an additional $14,213,454 above the mean average for 1960. These two items, totalling $17,273,593, are 41.5% of the $41,624,834 difference between the Company's current appraisal and net original cost found by the Commission.

The conclusion of the Commission to give limited weight to the appraisal of current value not only finds support in the

decisions of this Court (*C. & P. Telephone Co. v. Public Service Commission, Baltimore Transit Co. v. Public Service Commission,* and *Hagerstown v. Public Service Commission,* which have been cited above) but is consonant with the decisions and views of the courts of most of the jurisdictions in this country. The Company has cited cases in several States which have remanded rate cases because it was thought the regulatory body had not given proper weight to evidence of current value.[4] Often these turn on a controlling statute or particular facts of the case, and we do not find those which might be said to conflict with our prior decisions to be persuasive.

The testimony of the Company as to current appraisal of its plant is subject to many of the weaknesses noted in the opinion at page 183 of 201 Md. in *C. & P. Telephone Co. v. Public Service Commission* discussed above; as, for example, that the plant would not be rebuilt in its present form if it were rebuilt and the fact that the method used gives greatly unrealistic value to the oldest parts of the plant and equipment while appraisal of the new is almost the same under the historical value and current value tests.[5]

---

4. Cases the Company cites include Application of Diamond State Telephone Co. (Super. Ct., Del.), 103 A. 2d 304 (reversed 107 A. 2d 786); and see Application of Diamond State Telephone Co., 113 A. 2d 437; State v. Piedmont Natural Gas Co. (N. C.), 119 S. E. 2d 469, in which the Commission determined income and a rate of return and then calculated a rate base otherwise unsupported by substantial evidence (see State v. Public Service Co. of North Carolina, 125 S. E. 2d 457, 461; Central Maine Power Co. v. Public Utilities Commission (Me.), 109 A. 2d 512; Iowa-Illinois Gas & Electric Co. v. City of Fort Dodge (Iowa), 85 N. W. 2d 28).

5. In the article "The Hope Case and Public Utility Valuation in the States" in 54 Col. L. Rev. 188, the author, Joseph R. Rose, says in note 11: "Reproduction cost is defined as the estimated cost of constructing an identical plant at prices for labor and materials prevailing at the time of the valuation. But recently average prices over a period of time have been used rather than spot prices. See Pittsburgh v. Public Util. Comm'n, 165 Pa. Super. 519, 525, 69 A. 2d 844, 847 (1949). In the present postwar period a variation of reproduction cost, denominated 'current value cost' or 'trended original cost,' has been introduced. Under this method price in-

The record offers ample support for the finding of the Commission of fair value. Code (1957), Art. 78, Sec. 72, makes all final conclusions of the Commission prima facie evidence of value in proceedings had in pursuance of that Article. Under this section, the valuation made by the Commission in the 1952 case, which was sustained by this Court, became prima facie evidence of the then value in a subsequent rate proceeding. The Company expressly agreed to use that value as brought up to date by changes in net book cost in the 1953 and 1954 proceedings, and acquiesced in the use of that value similarly modified in the 1958 case by failure to seek judicial review of the finding of fair value made at that time. In *Baltimore Transit Co. v. Public Service Commission, supra,* we said at pages 548 and 549 of 206 Md.:

> "The 1948 figures were accepted by the Company without appeal. Code, 1951, Art. 78, Sec. 55 (c) provides that: 'All final valuations by the Commission shall be *prima facie* evidence of the value of said property in proceedings had in pursuance of this Article.' This is not to say that its failure to protest the 1948 value would bind or estop the Company but certainly, its acquiescence in the rate base found and used by the Commission in 1948 must be put on the scale when there is weighed the lawfulness and reasonableness of the current finding."

The Company's estimates of value in this case are closer to book value percentage-wise than in their studies in the 1952 case and the 1958 case. The Commission determined net original cost of plant at the end of 1960 to be $318,000,000, whereas the Company's appraisal of the then value of the property was roughly $360,000,000, so that net original cost is about 88.3% of currently appraised cost.

The Company offered no evidence to show any substantial inflation between 1958 and the time of the hearing in the present case. The People's Counsel produced expert testi-

---

dices are applied to an original cost base; the result is an estimate of reproduction cost on a piecemeal basis. Such an estimate is invariably in excess of true reproduction cost."

mony as to fair value, which was considerably lower than that the Commission ultimately found. The validity of the theory upon which the Company's appraisal of value was predicated was challenged by witnesses produced by the People's Counsel and by the intervening protestants. During the years 1958 and 1959 the Company received profits which exceeded profits on a rate of return authorized by the Commission. In 1958 this profit was $2,500,000 more than that authorized, and after adjustments for net additions to plant, the Company's 1959 earnings were more than 6.5% of the average fair value of its plant used in intrastate service although the rate of return authorized by the 1958 order was only 6.25%. Net annual intrastate revenues have increased from $7,396,890 in 1951 to $18,572,975 in 1959 and about $20,000,000 in 1960. The Company's earnings per share increased from seventy-two cents in 1951 to $1.95 in 1960 and its earned surplus rose from $3,901,528 in 1951 to $22,039,079 in 1960. In the ten-year period the Company's securities have been given the highest ratings.

The Company argues that the Commission's opinion (when it says the use of a readily measurable and factually determinable net original cost rate base leaves only one judgment figure or variable, that is, the rate of return, and when it says that the determination of a rate base arrived at by the use of trended costs or reproduction costs would allow the Company a return on dollars never invested) makes it clear that the Commission applied erroneous theories of law in arriving at its conclusions in this case. It says that although this Court has often ruled that a Commission order will not be reversed merely because the court, sitting in the place of the Commission, would have reached a different result, these rulings were based on the premise that the Commission has used correct legal principles in reaching the result. From this it argues that the court cannot uphold the Commission, even if it finds the result of its action valid, if the Commission gave the wrong reasons for reaching that result. Its reliance is on the principles enunciated in the case of *Securities & Exchange Commission v. Chenery Corp.*, 318 U. S. 80, 87 and 94, 87 L. Ed.

626, wherein the Court said: "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based" and "The Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify * * * [the] order * * *. There must be * * * a responsible finding."

The essential basis of the decision of the Supreme Court in the *Chenery* opinion was that the courts cannot review the actions of administrative bodies unless they are properly and adequately advised of the considerations which underlay the action under review. The opinion specified that the settled rule that if a lower court is right for the wrong reason there will be no reversal was not disturbed, but added that the rule included the corollary that if the correctness of a lower court's decision turns upon a determination of fact which had not actually been made, an appellate court cannot take the place of the trier of fact.[6]

We think that if the statements in the Commission's opinion which the Company seeks to use as showing the Commission gave wrong reasons for its action are read out of the context of its whole opinion, the Company would have a valid argument. So read, those statements would indicate that the Commission was adopting the philosophy of the case of *Federal Power Commission v. Hope Natural Gas Co.*, 320 U. S. 591, 88 L. Ed. 333, that only the end result is significant in the determination of the validity of rate making, and that, as a matter of law, no weight need be given to reproduction costs or current value, and neither of these propositions is in accord with the law of Maryland. We think, too, as did Judge Allen below, that the statements must be read in context and accepted as expressions of the reasoning which motivated the Commission in determining what weight it should and would give to the evidence of current appraisal submitted by the Company and that they did not mean that the Commission

---

6. See a discussion of the Chenery case and related cases in 2 Davis, Administrative Law Treatise, Sec. 16.12.

did not find fair value or that, in so doing, it gave no weight to the evidence of current value.

We conclude from the record that the Commission did state the reasons which influenced it in its findings of fact and that it followed the duty imposed upon it by the statutes in determining the fair value of the Company's property used and useful in rendering service to the public, and allowed a rate of return based upon the fair value so determined. The Commission could have given more explicit reasons for its use of the same allowance for current value than it did, and in all cases it should do what it did not do in this case and concisely state the reasons for its actions, as fully and explicitly as is reasonably possible, as the applicable Maryland statute and cases say it should. Yet we find what we quoted in *Baltimore Transit Company v. Public Service Commission, supra,* at page 545 of 206 Md. to be apposite here, as it was there: " 'The findings of the Commission in this regard leave much to be desired * * *. But the path which it followed can be discerned. And we do not believe its findings are so vague and obscure as to make the judicial review contemplated by the Act a perfunctory process.' "

We do not see the Commission's action in setting a rate base to be arbitrary, capricious, unsupported by substantial evidence, or otherwise affected by error in law.

We turn to the Company's contentions as to its right to have deducted from operating income for rate making purposes the income tax it actually paid to the federal government, and the charitable contributions it made.

In 1959 and 1960, as in earlier years, the Company filed a consolidated return with the sole owner of its stock, American Telephone and Telegraph Company (A. T. & T.), and some seventeen other telephone company subsidiaries of the parent. The filing of the consolidated return resulted in large annual savings to A. T. & T. amounting, for example, to some $52,000,000 in 1958 (because of the elimination of inter-company transactions). A. T. & T. retained all of this saving. A. T. & T. has a substantial funded debt outstanding so that the debt-equity ratio for the Bell System as a whole is appreciably

higher than that of the individual operating companies, including the appellant, the Maryland company. The federal income tax law permits the deduction of interest paid, so the tax liability of the Bell System is less than the aggregate liability of its component entities if computed separately.

All makers of a consolidated return are jointly and severally liable for the tax due. Each of the subsidiaries paid a tax computed as if it had filed an individual return which was larger than its proportionate share of liability under the consolidated return. For example, for 1960 the Company paid $144,110 more income tax than it would have if its liability had been figured by allocating to it a proportionate share of Bell System debt and deducting from taxable income the interest on such debt, calculated at the average interest cost of the System's outstanding debt.

Code (1957), Art. 78, Sec. 69, authorizes and directs the Commission to determine, as part of the process of fixing a just and reasonable rate, operating income which will yield *"after reasonable deduction for depreciation and other necessary and proper expenses and reserves"* a reasonable return on a fair rate base. (Emphasis supplied.)

It was pursuant to this authority that the Commission made the adjustment in income tax allowed to be deducted—an adjustment recommended, in such cases, by an accounting committee of the National Association of Railroad and Utility Commissioners and generally referred to as the NARUC tax adjustment.[7]

The Company says that the adjustment invaded the prerogative of a sound, honest and competent management and that the Commission could properly make the adjustment only on a finding of abuse of discretion, bad faith or wastefulness. It says the Commission is deciding what only the directors of the Company could decide—the proper corporate structure.

We think the Commission was justified in its action. The

---

7. The Commission did in this case what it had done in the 1954 and 1958 applications of the Company. The Company did not seek judicial review in those years. See 5 PUR 3d 161, 166-168; 22 PUR 3d 323, 331.

owner and managers of the Company have the right to determine what its debt-equity ratio should be, but they may not always make the rate payers foot the bill resulting from the choice. There was no legal need for the Company to pay more than its proportionate share of the joint tax liability. It has not shown any reason or necessity for its assumption of a tax liability greater than it owed or any particular consideration passing to it from A. T. & T., its sole owner, for contributing a gift to that owner.

The liability of the System, under the consolidated returns, was determined not on the basis of some seventeen different capital structures but on the basis of one composite structure with a 35% debt ratio (as against 18% for the Company). Since liability for taxes was figured on the theory of one system-wide entity, liability might fairly be set, as the Commission set it, among the component entities on a proportionate basis. There would seem to be no reason why Maryland telephone subscribers should pay more than the Company's proportionate share of the total Bell System tax liability.

The Company attacks the disallowance as based on a hypothetical debt structure. The structure was chosen by the Bell System management and was the one on which the Company had its tax liability established. The Company wishes to have its tax allowance based on a liability it would have if it had filed an individual return. It did not do so. The Commission allowed deduction of a tax liability which was the legal result of actual action taken by the Company and its owner, rather than one voluntarily assumed for the benefit of the owner.

There are cases upholding the Company's position. See *Application of Diamond State Telephone Co.* (Supreme Ct. Del.), 149 A. 2d 324, 328, and *Public Service Commission v. Indiana Bell Telephone Company* (Ind.), 130 N. E. 2d 467, 480. We are more impressed with the reasoning to the contrary of the majority of the regulatory bodies which have upheld the propriety of the Commission's stand,[8] and of the rea-

---

8. Re New Jersey Bell Telephone Co., 24 PUR 3d 181, 195, and cases cited; Re C. & P. Telephone Co. of West Virginia, 36 PUR 3d 417, 422-423; Re Northwestern Bell Telephone Co., 36 PUR

soning of cases such as *New England Tel. & Tel. Co. v. Dept. of Public Utilities* (Mass.), 121 N. E. 2d 896; *Southern Bell Tel. & Tel. Co. v. Louisiana Pub. Serv. Comm.* (La.), 94 So. 2d 431; and *Petitions of New England Tel. & Tel. Co.* (Vt.), 80 A. 2d 671 (which upheld regulatory action based upon hypothetical debt ratios where actual ratios were unrealistically low), which support it.

The Commission's decision was primarily one of fact as to the necessity and propriety of the tax payment as an operating expense for rate making purposes. The statute authorized the decision, and our inquiry is limited on appeal to passing on illegality and unreasonableness. *Public Service Commission v. Baltimore Transit Co.,* 207 Md. 524, 531; *Baltimore Gas Company v. McQuaid,* 220 Md. 373, 382, and cases cited. We find nothing unlawful or unreasonable in what was done.

Much of what has been said on the issue of the income tax deductions applies to the disallowance of charitable contributions. If charitable contributions are allowed as an operating expense of a monopoly, it amounts to an involuntary levy on the rate payers. Many courts and commissions have, on this premise, required the utility itself to bear the burden and not to pass it on to the subscribers. See *Central Maine Power Co. v. Pub. Utilities Comm.* (Me.), 136 A. 2d 726, 731; *Peoples Gas Light & Coke Co. v. Slattery* (Ill.), 25 N. E. 2d 482, 498; *Carey v. Corp. Comm.* (Okla.), 33 P. 2d 788, 794.[9]

---

3d 67, 71 (S. D.); Re Northwestern Bell Telephone Co., 2 PUR 3d 93, 95-96 (N. D.); Re Southwestern Bell Telephone Co., 2 PUR 3d 1, 17 (Ark.); Accord: Pub. Serv. Comm. v. General Telephone Co., 30 PUR 3d 145 (Wash.).

9. See also: Re Joplin Water Works, 39 PUR 3d 504, 510 (Missouri); Re C. & P. Tel. Co., 36 PUR 3d 417, 421 (West Virginia); Re Wisconsin Tel. Co., 23 PUR 3d 388, 391-392 (Wisconsin); Re Pacific Gas & Electric Co., 21 PUR 3d 48, 53-54 (California); Re Southern New England Telephone Co., 20 PUR 3d 34, 39 (Connecticut); Re Washington Gas Light Co., 61 PUR (NS) 40, 41 (District of Columbia); Re Tampa Electric Co., 37 PUR (NS) 440, 496-497 (Florida); Re Union Light, Heat & Power Co., 97 PUR (NS) 33, 40 (Kentucky); Re New England Tel. & Tel. Co., 83 PUR (NS) 238, 340 (Massachusetts).

We think the Commission did not err in doing this in the present case.

*Order affirmed, with costs.*