## PUBLIC SERVICE COMMISSION OF MARYLAND et al. *v.* BALTIMORE GAS AND ELECTRIC COMPANY

[No. 152, September Term, 1974.]

*Decided December 19, 1974.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Edward F. Shea, Jr.*, and *Joseph Sherbow*, with whom were *Sherbow, Shea & Doyle* on the brief, for Public Service Commission of Maryland, part of appellants. *Gary R. Alexander*, with whom was *Donald F. Rogers* on the brief, for People's Counsel to the Maryland Public Service Commission, part of appellants. *Charles Freeland* and *William Hughes, Assistant City Solicitors,* with whom were *Benjamin L. Brown, City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for Mayor and City Council of Baltimore, other appellant.

*James A. Biddison, Jr.*, and *Cameron F. MacRae*, with whom were *Samuel M. Sugden, Paul W. Davis* and *Larry D. Lamson* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

On September 10, 1973, the Baltimore Gas and Electric Company (the Company) filed revised schedules of electric and steam rates with the Public Service Commission (the Commission) designed to produce an additional $32,400,000 (a 10% increase in gross annual revenues. The Company's

application was predicated upon the use of an end of the test year period or "terminal" rate base in valuing its utility property for rate making purposes, a rate of return of 8.35% and an increase from 3.0% to 3.2% in the composite rate of annual depreciation for the Company's electric properties. The Commission suspended the Company's proposed rates for the maximum period authorized by Maryland Code (1969 Repl. Vol.) Art. 78, § 70 and held extensive hearings involving 3,000 pages of testimony and numerous exhibits (Commission's Case No. 6700).[1] By its Order No. 60684 and Opinion dated, respectively, March 8 and 26, 1974, the Commission concluded that the appropriate test year for rate making purposes was the twelve-month period ending October 31, 1973; that the "use of this recent test period gives almost current recognition to the level of expenses as affected by inflation and minimizes the impact of regulatory lag"; that it was appropriate in the circumstances to utilize an average, rather than a terminal rate base, and that the average fair value of the Company's total utility property for rate making purposes for the test period was $1,656,625,000; that a fair and reasonable rate of return on the Company's rate base was 8.2%; and that the increased rate of annual depreciation sought by the Company for its electric properties would not be allowed. As a result, the Commission authorized the Company to increase its electric and steam rates by approximately $9,000,000.

The Company appealed to the Circuit Court for Calvert County; it claimed that the Commission's decision to employ an average, rather than a terminal rate base, constituted error since it failed to give due consideration to substantial evidence of inflation, attrition and regulatory lag, and was therefore unlawful, arbitrary, capricious and not supported by substantial evidence. The Company contended that the Commission also erred in finding that 8.2% constituted a fair rate of return on its rate base and that the

---

1. A petition filed by People's counsel for a reduction in the Company's gas rates was consolidated with the Company's application for revision in electric and steam rates and was made a part of the proceedings.

Commission's failure to authorize an increase in the composite depreciation rate on its electric properties from 3.0% to 3.2% completely ignored the uncontradicted evidence that such increase was justified and required.

On the record made before the Commission, the lower court (Bowen, J.), by decree dated August 29, 1974, reversed the Commission's decision to use an average rate base in valuing the Company's property for rate making purposes; the court directed instead that the Commission use an end of the test year or terminal rate base. It also reversed the Commission's finding with respect to depreciation of the Company's electric properties and ordered that the claimed depreciation rate of 3.2% be allowed. The court remanded the case to the Commission for redetermination of the proper rate of return in accordance with its opinion and "in the context of the holdings herein on Depreciation and Rate Base." From the court's decree, the Commission, People's counsel, and the Mayor and City Council of Baltimore (an intervenor in the proceedings below) appealed; the Company filed a cross-appeal, claiming that the court's decree should be modified to require a rate of return not lower than 8.5%.

The Public Service Commission Law, Code, Article 78, § 68 (the Law) empowers the Commission "to determine just and reasonable rates of public service companies." Section 69 of the Law specifies that "just and reasonable rates" mean "rates which are not in violation of any of the provisions of this article, and which will result in an operating income to the public service company, . . . yielding, after reasonable deduction for depreciation and other necessary and proper expenses and reserves, a reasonable return upon the fair value of the company's property used and useful in rendering service to the public." [2] Section 72 provides that

---

2. The orthodox making of public utility rates requires four basic determinations: (1) what are the enterprise's gross utility revenues under the rate structure examined; (2) what are its operating expenses, including maintenance, depreciation and all taxes, appropriately incurred to produce those gross revenues; (3) what utility property provides the service for which rates are charged and thus represents the base (rate base) on which a return should be earned and (4) what percentage figure (rate of return) should be applied to the rate base in order to establish the return to which investors in the utility enterprise are reasonably entitled. 1 A. J. G. Priest, *Principles of Public Utility Regulation* 45 (1969).

all final valuations made by the Commission shall be prima facie evidence of value. Section 84 (b) of the Law provides that "[i]n any proceeding involving a new rate, or change in any rate, whether temporary or permanent, the burden of proof shall be on the proponent of the new rate or change in rate." Judicial review of final decisions or orders of the Commission is authorized by §§ 89-98, inclusive, of the Law. Section 91 (a) provides that such review "shall be instituted in the circuit court for any county within which operations are carried on by the public service company involved, or in any equity court in Baltimore City." A "further review" is authorized by appeal to the Court of Appeals. § 98. The scope of judicial review of orders of the Commission is set forth in § 97:

> "Every final decision, order, rule or regulation of the Commission shall be prima facie correct and shall be affirmed unless clearly shown to be (1) in violation of constitutional provisions, or (2) not within the statutory authority or jurisdiction of the Commission, or (3) made upon unlawful procedure, or (4) arbitrary or capricious, or (5) affected by other error of law, or (6) if the subject of review is an order entered in a contested case after hearing, such order is unsupported by substantial evidence on the record considered as a whole."

Consistent with these statutory provisions, we said in *C. & P. Tel. Co. v. Public Service*, 230 Md. 395, 401, 187 A. 2d 475, 478 (1963), that "every final decision of the Commission prima facie shall be correct and shall be affirmed on appeal *to the courts* unless shown to be unconstitutional, or without statutory authority or made upon unlawful procedure, or arbitrary or capricious, or unsupported by substantial evidence on the record considered as a whole, or is affected by other error of law." (emphasis supplied) In *Balto. Gas Co. v. McQuaid*, 220 Md. 373, 382, 152 A. 2d 825, 829-30 (1959), a case involving, as here, a determination of the rate base of a public service company, we said: "Our inquiry is limited to

finding whether there was illegality or unreasonableness in the Commission's action — when that inquiry is finished, judicial scrutiny ends and the judicial function in the rate making process is over." Recognizing that rate making is a legislative function, *Gregg v. Public Service Commission*, 121 Md. 1, 87 A. 1111 (1913), we have held repeatedly that a reviewing court will not substitute its judgment for that of the Commission, a body informed by experience and aided by a competent and experienced staff, and that consequently an order of the Commission will not be disturbed on appeal except upon clear and satisfactory evidence that it is unlawful or unreasonable. *See Public Service Commission v. Balto. Trans. Co.*, 207 Md. 524, 114 A. 2d 834 (1955); *Balto. Trans. Co. v. Pub. Ser. Comm.*, 206 Md. 533, 112 A. 2d 687 (1955); *Montgomery Co. v. Public Serv. Comm.*, 203 Md. 79, 98 A. 2d 15 (1953); *Pub. Serv. Commn. v. United Rwys. Co.*, 155 Md. 572, 142 A. 870 (1928); *Public Service Commn. v. Byron*, 153 Md. 464, 138 A. 404 (1927). We do not, therefore, in considering the legality and reasonableness of the Commission's decision in this case, afford prima facie correctness to the decree of the court below; nor do we determine merely whether the court abused its discretion in reviewing the Commission's order, as suggested by the Company. We do not directly review the reasonableness of the determinations made by the lower court, but instead consider whether there was substantial evidence before the Commission on the record considered as a whole to support its use of an average rate base, a 3.0% composite rate of depreciation, and a 8.2% rate of return. In so determining, we are governed by principles of judicial review of decisions of administrative agencies so well articulated for the Court by Chief Judge Hammond in *Insurance Comm'r v. Nat'l Bureau*, 248 Md. 292, 309-10, 236 A. 2d 282, 291-92 (1967):

> "Whichever of the recognized tests the court uses — substantiality of the evidence on the record as a whole, clearly erroneous, fairly debatable or against the weight or preponderance of the evidence

on the entire record — its appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence. The required process is difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. There are differences but they are slight and under any of the standards the *judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.* This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment." (Emphasis supplied.)

### Rate Base

As heretofore indicated, the rate base is the "fair value of the company's property used and useful in rendering service to the public" upon which the Company is entitled to earn a reasonable rate of return, viz., a return which will result in as much net operating income as will yield a reasonable return on the rate base fixed. Article 78, § 69; *C. & P. Tel. Co. v. Public Service, supra.* As we observed in *Balto. Gas Co. v. McQuaid, supra:*

"Rate making necessarily is predictive since it is the legislative process of making a rule for the future. *Gregg v. Public Service Commission,* 121 Md. 1, 28; *McCardle v. Indianapolis Water Co.,* 272 U. S. 400, 408-409, 71 L. Ed. 316, 324 ('It must be determined whether the rates complained of are yielding and will yield, * * * a sum sufficient to constitute just compensation for the use of the property employed to furnish the service; that is, a reasonable rate of return on the value of the property at the time of the investigation and for a reasonable time in the immediate future'); *Chesapeake & Potomac Tel. Co. v. Public Service Comm.,* 201 Md. 170, 180,

quoting from *San Diego Land & Town Co. v. Jasper*, 189 U. S. 439, 442, 47 L. Ed. 892 ("* * * "what the company is entitled to demand, * * * is a fair return upon the reasonable value of the property at the time it is being used for the public." '). This being so, the courts have recognized, as we have noted, that the rate of return of tomorrow need not be fixed solely on the facts of today but that reasonable estimates of what tomorrow may bring also may be relied on. . . ." 220 Md. at 382-83, 152 A. 2d at 830.

The rate base, usually measured over a twelve-month period called the test year, is calculated primarily in one of two ways: valuation as of the last day of the test year (end of the test year or terminal rate base), or valuation averaged over the entire test year (average rate base). The Company submitted evidence to the Commission showing both a terminal rate base ($1,742,035,000) and an average rate base ($1,656,625,000) for the test period; a witness for People's counsel, the Commission's Chief Auditor, also made calculations of both bases, fixing the terminal rate base at $1,735,220,000 and the average at $1,648,717,000. The Company argued that a terminal rather than an average rate base should be employed to compensate for attrition, inflation, regulatory lag and the shortfall in earnings. It relied upon our decision in *McQuaid* where we approved the Commission's use of a terminal rate base to take these factors into account.[3] In adopting the average rate base, the Commission accepted the Company's fair value calculations and followed the recommendation of witnesses for People's counsel and the General Services Administration, an

---

3. Inflation, of course, increases the cost of providing service, although rates remain stable throughout the test year; "attrition" is the term applied to the reduction in the rate of earnings resulting from additions to plant at costs higher than the value of similar items in the rate base, so that the relation between rate base and rate of return deteriorates. In other words, attrition — the decline in the rate of return earned — results when the rate base expands faster than the revenue and is caused both by inflation and by expansionistic construction programs which do not generate additional comparable revenue. Regulatory lag is the delay in securing rate relief after the need has become known. *McQuaid, supra*, 220 Md. at 381, 152 A. 2d at 829.

intervenor in the proceedings. In its opinion, the Commission said:

"In the last proceeding involving the rates of Baltimore Gas and Electric Company (Case No. 6542) the Commission used an average rate base and specified several reasons. In this immediately prior case the Commission on October 13, 1972, entered its Order No. 60005 authorizing an annual increase in electric rates to produce not more than $13,213,000; an annual increase in gas rates to produce not more than $1,815,000; and an annual increase in rates for steam service to produce not more than $147,000. In authorizing the increase at that time, the Commission used a test year that had ended on June 30, 1972, some three and one-half months earlier.

"In the present proceeding, Case No. 6700, the Commission issued its order authorizing higher rates on March 8, 1974, using as the test year, the 12 months period ended October 31, 1973.

"Pursuant to this Order, the Company filed rates which became effective with meter readings taken on and after March 15, 1974, and these higher rates have applicability as early as within three and one-half months of the end of the test period thus reducing regulatory lag.

"In its decision in Case No. 6542, the Commission noted the relatively short time period that had elapsed since its Order dated May 26, 1971, authorizing the Company to increase rates in the then immediately prior case (Case No. 6395) and the application filed by the Company on April 17, 1972, in Case No. 6542 for an increase in rates. The Commission again notes the relatively short time period that has expired since its Order dated October 13, 1972, in Case No. 6542 and the filing of the petition on September 10, 1973, in this proceeding (Case No. 6700)."

* * *

"The Commission is of the opinion that a terminal rate base should not be adopted in this proceeding in view of the very recent test period for this Company and the short period of time that has elapsed since the last rate case. We conclude, therefore, that rates for the future for the Company should be set on the fair value rate base averaged over the 12 month period ended October 31, 1973, which gives appropriate recognition to past inflation."

In reversing the Commission's decision, the lower court concluded that the Company was experiencing rapid growth and that the terminal rate base formed a more accurate basis of fixing rates to be paid in the future. The court said that a review of the authorities indicated a pattern of using an average rate base where economic conditions were relatively stable, companies were growing, and there was little elapsed time between the request for rate relief and the decision of the regulatory agency. The court said that where evidence shows substantial attrition or substantial regulatory lag, a terminal rate base should be used. It held that the Commission's choice of methods "must be based on the evidence presented to it and must be consistent with its actions in similar situations to satisfy the test of reasonableness." The court held that the Company had presented "conclusive evidence" of attrition and had shown rapid inflation, rapid growth, and an inability to earn the rate of return authorized by the Commission in the Company's immediately preceding rate case. For these reasons, it concluded that "conclusive evidence" existed supporting the use of a terminal rate base and that, accordingly, the Commission's use of an average rate base was unreasonable.

We think the Commission's determination to employ an average rate base in valuing the Company's property used and useful in rendering service to the public was not illegal, arbitrary or capricious, but on the contrary was supported by substantial evidence on the record considered as a whole and should have been affirmed. In determining fair value for

rate making purposes, "the Commission is not bound to accept any one factor or method, or any particular combination of these or to accept any particular kind of evidence." *C. & P. Tel. Co. v. Public Service, supra,* 230 Md. at 404, 187 A. 2d at 480. Furthermore, the Commission's "finding of fair value must only reflect 'the reasonable judgment of the Commission, based on all relevant facts of which several only, or indeed but one, may prove to be controlling.'" *Id.* (quoting *Balto. Trans. Co. v. Pub. Serv. Comm.,* 206 Md. at 547, 112 A. 2d at 693). Thus, to the extent that the Commission was reasonably convinced of the existence of the problems of inflation, attrition and regulatory lag, "[i]t could have attempted to meet them in various ways," *McQuaid, supra,* 220 Md. at 382, 152 A. 2d at 829. *See generally Southwestern Bell Tel. Co. v. State Corp. Comm'n,* 192 Kan. 39, 386 P. 2d 515 (1963); *New England Tel. & Tel. Co. v. Department of Public Utilities,* Mass., 275 N.E.2d 493 (1971); *New England Tel. & Tel. Co. v. State,* 113 N. H. 92, 302 A. 2d 814 (1973); *State v. New Jersey Bell Tel. Co.,* 30 N. J. 16, 152 A. 2d 35 (1959); *Narragansett Electric Co. v. Kennelly,* 88 R. I. 56, 143 A. 2d 709 (1958), and cases cited therein. We are satisfied from our review of the record that the Commission considered all of these factors in deciding to adopt an average rate base. We note that in the Company's preceding rate case (No. 6542), the Commission used an average rate base. The Company did not appeal this determination. This valuation, including the method of valuation, becomes prima facie evidence in subsequent proceedings. Article 78, § 72. As we have explained,

> "'This is not to say that its failure to protest . . . would bind or estop the Company but certainly, its acquiescence in the rate base found and used by the Commission [in the earlier case] must be put on the scale when there is weighed the lawfulness and reasonableness of the current finding.'"

*C. & P. Tel. Co. v. Public Service, supra,* 230 Md. at 408, 187 A. 2d at 482, quoting *Balto. Trans. Co. v. Pub. Ser. Comm., supra,* 206 Md. at 548-49, 112 A. 2d at 693. Of course, the

Commission is not bound by its prior use of the average rate base. Considering, however, that the burden of proof is upon the proponent of the new rates, the Commission's use of and the Company's acquiescence in the average rate base in the immediately preceding rate case is an element tending to support the reasonableness of the Commission's present decision.

That inflation, attrition, and regulatory lag may exist does not mandate the Commission's use of a terminal rate base to resolve these problems. *Balto. Gas Co. v. McQuaid, supra; New England Tel. & Tel. Co. v. Department of Public Utilities, supra; Southwestern Bell Tel. Co. v. State Corp. Comm'n, supra. But cf. North Carolina ex rel. Util. Comm'n v. Piedmont Nat. Gas. Co.*, 254 N. C. 536, 119 S.E.2d 469 (1961); *Arlington County Bd. of Supervisors v. Virginia Elec. & Power Co.*, 196 Va. 1102, 87 S.E.2d 139 (1955). In the present case, the Commission reduced the regulatory lag to three and one half months by using a test year ending October 31, 1973. Additionally, the choice of the latest test period for which figures were available (as distinguished from the test year originally proposed by the Company, ending June 30, 1973) provided, in the words of the Commission, "almost current recognition to the level of expenses as affected by inflation . . . ."

The Commission made other adjustments to compensate for inflation (and, consequently, regulatory lag and attrition). In finding that the fair value of the Company's property, averaged over the test year, amounted to $1,656,625,000 (consistent with the Company's own calculations, and including a fair value increment of $20,378,000), the Commission made the following allowances:

> (1) The "spot" figure of $41,027,000 as of October 31, 1973 for the allowance for material and supplies, as "more representative of the current level of costs" than the average figure over a thirteen-month period.
>
> (2) The Company's figure of $5,400,000 for

compensatory bank balances, necessary under present economic conditions to keep open levels of credit, rather than the figure of $650,000 which the Commission's Chief Auditor deemed fair. (3) The computation of the "lag study" for cash working capital based upon the Company's pro forma expenses rather than upon the figures experienced in the past, thus allowing inclusion in the rate base of $22,811,000, as recommended by the Company instead of $17,704,000, as recommended by the Commission's Chief Auditor.

(4) The value of land held for future use at the Perryman site ($2,925,490) over objection of People's counsel.

(5) The rate of capitalization in the allowance for funds used during construction, which rate had been increased from 6.5% to 7.69% in the preceding case (No. 6542).

The Commission also made adjustments to compensate for inflation by reducing the Company's net operating income by $2,807,000 to reflect annualized wage increases, higher pension costs, and greater research and development expenses. (This reduction for expenses not actually incurred throughout the test year, would appear to be equivalent to an increase of approximately $34.2 million in the rate base, for the purposes of determining the additional revenue to be produced by the new rates.)

Contrary to the lower court's holding, the Company's failure to earn the authorized rate of return is not the "final test" of attrition. An authorized rate of return is not a guarantee of any level of revenues or return. *See, e.g.,* 1 A. J. G. Priest, *Principles of Public Utility Regulation* 202-03 (1969). Rather, attrition is evidenced by a decline in the earned rate of return. Furthermore, even if the evidence that the Company had failed to earn its authorized rate of return was not disputed (and there was evidence to the contrary), the evidence of a decline in the actual rate of return, and of the factors causing it, was conflicting and

inconclusive. For example, the Company offered as evidence of attrition an exhibit showing increases in plant investment per customer and additional plant investment per additional customer from 1967 to 1972. The Commission's Chief Auditor criticized this exhibit and offered evidence showing that while the electric utility plant in service per customer increased from $993 in 1967 to $1,501 in 1972, the Company's gross revenue per customer had increased from $273 to $418 and its net operating income per customer had increased from $57 to $98 (an increase of 71.93%). The Company, through its president, also claimed that increased wages and salaries had contributed to the attrition of the Company's earnings, yet the Company's evidence showed that labor costs per kilowatt hour had remained constant in 1972 and 1973 at 33¢. Given the contradictory and unexplained nature of the evidence of attrition, and the testimony of the expert witness for People's counsel that use of an average rate base best ties in the rate base with the actual revenues produced by it, the expenses incurred, and the investment made, we cannot find that the Commission's use of an average, rather than terminal rate base, was unlawful or unreasonable. We note, in so concluding, that there was evidence before the Commission that use of a terminal rate base may result in distortion, since the revenues earned during the test year may not correspond to the rate base at the end of the year. Indeed, the Company's financial officer, F. Edward Rugemer, testified that the Company had gained new customers; that usage had increased 11-14% during the test year; but that no adjustment in the revenues for the test year to reflect these increases was made.

We note also the relatively short period of time since the Company's last two rate proceedings. While the Company argues that at best this is irrelevant, and at worst it shows the Company's inability to earn its authorized rate of return, it demonstrates the ability of the Commission to respond quickly to the Company's request for rate increases and thus constitutes an effective means of correction for attrition. Between November 10, 1970, when the Company filed an application for rate increases in Case No. 6395, and March 8,

1974, when the Commission issued its order in Case No. 6700, the Commission fully considered three cases (Nos. 6395, 6542, and 6700) and granted increases in rates of, respectively, $20,828,231; $15,175,000; and $9,077,000. Aside from the putative attrition throughout any test year, the Commission's almost yearly consideration of rate requests can effectively prevent any longer term attrition. Under these circumstances, use by the Commission of a terminal rate base would hardly be mandated, as directed by the lower court.

To the Commission is committed the ascertainment of facts which rest in conflicting evidence, and we must not substitute our judgment for that of the Commission. Consequently, considering all of the evidence before the Commission and the various ways in which the Commission dealt with the Company's requests, we hold that the Commission's use of the average rate base was supported by substantial evidence and must be affirmed.

### Depreciation

Contrary to the holding of the lower court, we think that the Commission's decision to continue to allow a composite depreciation rate for the Company's electric properties of 3% and to deny the Company's request to increase the rate to 3.2% was neither illegal, arbitrary or capricious, nor unsupported by substantial evidence on the record considered as a whole.[4] The Company for a number of years

---

4. The Company is entitled in a rate proceeding to a "reasonable deduction for depreciation." Art. 78, § 69 (a). The definition of depreciation is, of course, well recognized:

"Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence. Annual depreciation is the loss which takes place in a year." Lindheimer v. Illinois Bell Tel. Co., 292 U. S. 151, 167, 54 S. Ct. 658, 664-65, 78 L. Ed. 1182, 1192-93 (1934) (footnote omitted).

We anticipated this definition in Pub. Serv. Commn. v. United Rwys. Co., 155 Md. 572, 142 A. 870 (1928); we said that "the company is entitled to such an allowance as will not only adequately provide for current repairs, but for depreciation due to necessary retirements, obsolescence, and the diminishing utility of property which cannot be arrested by repairs." 155 Md. at 601, 142 A. at 880.

prior to the filing of the instant case had been using a composite rate of 3% to depreciate its electric properties. It sought to increase its 3% depreciation allowance, which amounted to $31,260,000, to 3.2% or $33,281,000. In passing upon the Company's request, the Commission set forth a detailed summary of the evidence adduced by the Company to justify the proposed increase; it concluded "that no change in the level of the depreciation rates for electric property, which are based in part on changes in technology, should be made in this rate case" and that the proposed change "should be the subject of separate future consideration by the Commission." The lower court viewed this determination as an unlawful deferral beyond the maximum time limit permitted by Article 78, § 70. In the alternative, the court stated that, if the Commission's action constituted a denial of the increase, the denial was "unsupported by any competent evidence before the commission."

We agree that it was incumbent upon the Commission to decide whether the requested increase was justified by the evidence. We do not think, however, that the Commission's decision constituted an unlawful deferral of the question. The Commission fixed the rate of depreciation at 3.0% because it believed "no change" was necessary. Although its reasons for denying the increase leave much to be desired, the Commission's decision to retain a 3% rate of depreciation was neither illegal nor unreasonable.

The Company's request for a higher rate of depreciation was based upon asserted rapid changes in technology and the need for earlier retirement of facilities to comply with environmental requirements. To support its claim, the Company presented the expert testimony of George Faust, a principal consulting engineer with Gilbert Associates, Inc. Faust described the various methods by which he arrived at his conclusion. Following the straight line remaining life method, he estimated the average remaining lives of various types of property; he estimated the amount of net salvage; and, after accounting for obsolescence, he determined the remaining life accrual. From this data, he concluded that a 3.5% composite depreciation rate would be reasonable. Thus,

the 3.2% rate of depreciation requested by the Company was within the ambit of the witness' conclusions. Faust was extensively cross-examined. He said that the determination of the lives of the Company's various properties was a matter of judgment; that there had been a divergence of opinion among the Company's operations, engineering, and finance employees; and that a subsequent study would probably result in a different estimate of the lives of the property. The Commission thus had before it only one expert's opinion concerning the appropriate rate of depreciation, and could use its expertise to evaluate the expert's testimony and to accept or reject it. *See, e.g., Duncan v. McNitt Coal Co.*, 212 Md. 386, 129 A. 2d 523 (1957). *See also Pennsylvania R. Co. v. Stallings*, 165 Md. 615, 170 A. 163 (1934), and Cohen, *Some Aspects of Maryland Administrative Law*, 24 Md. L. Rev. 1, 16-18 (1964). While Faust thoroughly explained the procedures by which he arrived at his conclusions, there was no direct evidence to support the Company's contention of rapid changes in technology or accelerated retirement of facilities caused by environmental concerns. Other than to state that there had been considerable expenditures made for environmental protection, Faust was unable to affirm that such changes required an increase in the rate of depreciation. Moreover, Faust testified that changes in technology, still far off in the future, would not affect the current depreciation. Thus, while his conclusions may have been reasonable, they did not demonstrate that a change in circumstances required an increase in the 3% rate of depreciation previously found reasonable by the Commission. Since the Commission could reasonably have concluded that the Company had not carried its burden of justifying the requested increase in the depreciation rate, the continuation of the 3.0% rate was not unreasonable. *Cf. C. & P. Tel. Co. v. Public Service, supra*, 230 Md. at 406, 187 A. 2d at 481.

## Rate of Return

The 8.2% rate of return fixed by the Commission was neither unlawful, arbitrary, capricious nor unsupported by substantial evidence on the record considered as a whole.

Three expert "rate of return" witnesses testified before the Commission — Dr. Phillips for the Company, Edgar Bernstein for People's counsel, and Jerome Nicholas for the General Services Administration. Each witness, in giving his opinion of a fair rate of return on the Company's rate base, purported to be guided by the governing criteria established by the Supreme Court in *Bluefield Waterworks & Improvement Co. v. Public Service Commission*, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176 (1923) and *Federal Power Commission v. Hope Natural Gas Co.*, 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944).[5] There were no substantial differences between the testimony of the three experts except with respect to the appropriate rate of return on common equity. Phillips said that the cost rate to be used on common equity was between 13.5% and 14.0%; Nicholas testified that the rate should be 11.81%; and Bernstein arrived at a return of 11.5%. Phillips and Nicholas found that the cost component of the Company's long-term debt was 5.93% while Bernstein found it to be 5.92%. Phillips and Nicholas found the cost component of preferred stock to be 7.02% while Bernstein fixed the figure at 7.11%. Applying these cost components to the Company's capital structure as of October 31, 1973, Phillips testified that the fair rate of return on the rate base was from 8.95% to 9.14%; Bernstein said it was 8.2% and Nicholas said it was 8.3%.

In *Balto. Trans. Co. v. Pub. Ser. Comm.*, *supra*, we said:

"There is no requirement that there must be any given percentage of return on the fair value of property. Between the lowest return that is not unreasonable to the point of being confiscatory and the highest that is not inordinate, there is a rather

---

5. *See also* In re Permian Basin Area Rate Cases, 390 U. S. 747, 88 S. Ct. 1344, 20 L.Ed.2d 312 (1968).

wide zone in which a return may be reasonable under some circumstances and not under others." 206 Md. at 555, 112 A. 2d at 697.

We think that the Commission's determination (Commissioner Shoemaker dissenting), that a fair rate of return was 8.2%, was within the zone of reasonableness and was plainly supported by substantial evidence.

### Jurisdiction

The City raised the issue of lack of jurisdiction in the Circuit Court for Calvert County to entertain the appeal, and it alone pursues the issue here. The controlling statutory provision is Article 78, § 91:

> "Proceedings for review under § 90 of this article shall be instituted in the circuit court for any county *within which operations are carried on by the public service company involved,* or in any equity court in Baltimore City." (Emphasis supplied.)

As revealed in the proceedings below, in 1973 the Company had in Calvert County approximately 2,100 electric customers, which amounted to 0.283% of all its electric customers, and no gas or steam customers. These customers produced $650,000 in revenues, about 0.184% of its electric revenues ($353,432,000) and 0.137% of its total revenues ($473,622,000). The Calvert Cliffs Nuclear Power Plant had not been completed as of March 31, 1974, but over $545 million had been expended for its construction.

The City urges that the Company is not carrying on operations in Calvert County because it does a minimal amount of business, compared with its total operations, in Calvert County. It relies upon *Liller v. Logsdon*, 261 Md. 367, 370, 275 A. 2d 469, 471 (1971) where, citing from *Webster's Third New International Dictionary* 1581 (unabridged ed. 1961), we defined the term "operations" as "the whole process of planning for and operating a business or other organized unit." Since the Company's operations in Calvert

County were "so miniscule in relationship" to its entire operations, the City contends that the lower court had no jurisdiction in the case.

We think the City's argument is frivolous. In construing § 91, we should give effect to the legislative intent as expressed by the words used. *Scoville Serv., Inc. v. Comptroller,* 269 Md. 390, 306 A. 2d 534 (1973); *Giant of Md. v. State's Attorney,* 267 Md. 501, 298 A. 2d 427 (1973). The statute requires that "operations" be carried on in the county in which review is sought, not that a substantial part of the operations be carried on in that county. In view of the evidence, it is patent that the Company carries on "operations" in Calvert County and that the Circuit Court for Calvert County had jurisdiction to hear the Company's appeal.[6]

> *Decree of Circuit Court for Calvert County vacated; order No. 60684 of the Public Service Commission in case No. 6700 affirmed as to all issues decided by this opinion; costs to be paid by appellee.*

---

**6.** *Liller* is neither legally nor factually relevant. That case involved an easement which automatically terminated one year after "mining operations" ceased. We upheld the chancellor's finding that the removal of 25 tons of coal, six tons of coal, and a shovel full of coal did not constitute mining operations. We were not concerned solely with the definition of "operations"; we were concerned with the definition of "mining" and with the chancellor's findings, which emphasized the sporadic nature of the appellant's operations.