486 A.2d 744

**PRINCE GEORGE'S DOCTORS' HOSPITAL, INC. t/a
Doctors' Hospital of Prince George's County**

v.

**HEALTH SERVICES COST REVIEW COMMISSION and
Group Hospitalization, Inc.**

**No. 99, Sept. Term, 1984.**

Court of Appeals of Maryland.

Jan. 16, 1985.

194

Melvin J. Sykes, Baltimore (William L. Siskind and Siskind, Burch, Grady & Rosen, Baltimore, on the brief), for appellant.

Jay E. Levy and Diana G. Motz, Asst. Attys. Gen., Baltimore (Stephen H. Sachs, Atty. Gen. and Stanley Lustman, Asst. Atty. Gen., Baltimore, on the brief), for Health Services Cost Review Com'n, appellee.

Charles J. Steel, Washington, D.C. (Lisa A. Olson and Whiteford, Hart, Carmody & Wilson, P.C., Washington, D.C., of counsel, on the brief), for Group Hospitalization, Inc., appellee.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and EDWARD D. HIGINBOTHOM, Associate Judge of the Third Judicial Circuit of Maryland (retired), Specially Assigned.

SMITH, Judge.

Appellant Prince George's Doctors' Hospital, Inc., (the Hospital) is of the view that the Health Services Cost Review Commission (the Commission) was too stingy in its allowance of rates to it. On the other hand, Group Hospitalization, Inc. (Group Hospitalization), Blue Cross for the District of Columbia metropolitan area, believes the Commission was entirely too generous with the Hospital. We think the Commission had it about right. Hence, we shall affirm in both appeals.

## I

The Hospital is a proprietary (for-profit) 240-bed acute care medical/surgical hospital owned and operated by physicians. As its name indicates, it is located in Prince George's County. Its principal owners are also principals in Prince George's Doctors' Hospital Joint Venture, which owns the hospital building.

On November 7, 1983, the Commission issued its final order in a rate-making proceeding involving the Hospital. Group Hospitalization, which insures approximately 35% of the patients at the Hospital, intervened as an interested party before the Commission. The Hospital had requested rates that would generate in excess of $41.5 million in gross revenue per year. The Commission's final rate order approved rates for the Hospital that, according to the Commission, would generate $35.1 million in gross revenue. The Commission found that the Hospital had overcharged its patients by some $16.8 million since September 1982 when it placed its requested rates into effect. We shall develop additional facts as we discuss the various points raised.

The Hospital and Group Hospitalization appealed to the Circuit Court for Baltimore City. That court, in a comprehensive and well-reasoned opinion by Judge Ross, from which we shall quote liberally, affirmed the Commission's order with certain modifications. The Hospital and Group Hospitalization each appealed to the Court of Special Appeals. All parties petitioned us to grant a writ of certiorari before the case was heard in the intermediate appellate court. The Hospital asserted that implementation of the Commission's order as approved by the trial court would place it in financial jeopardy, possibly in bankruptcy. Accordingly, the Hospital requested that we stay the circuit court's order. We declined the Hospital's request. We did grant certiorari in an effort to resolve the matter speedily.

## II

2 P. Lasky, *Hospital Law Manual* App. C (1983), lists thirteen states as of December 1983 which have enacted legislation designed to reduce hospital costs by monitoring rates charged. A number of other states have voluntary programs. See *Id.* ¶ 3–62; Biles, Schramm, and Atkinson, *Hospital Cost Inflation Under State Rate-Setting Programs*, 303 New Eng.J.Med. 664, 665 (1980); D. Abernethy and D. Pearson, *Regulating Hospital Costs: The Development of Public Policy* 60 (1983); Schramm, *A State-Based Approach to Hospital-Cost Containment*, 18 Harv.J. on Leg. 603, 605, n. 12.

The Commission is established, its duties spelled out, and the procedures it is to follow are set forth in Maryland Code (1982) §§ 19–201 to –222, Health-General Article.[1] Under our act the Commission is vested with jurisdiction over the

---

1. The original enactment was by Ch. 627 of the Acts of 1971. When this controversy originated the pertinent statutory provisions were found in Code (1957, 1980 Repl.Vol.) Art. 43, §§ 568A–568Z. Code revision moved the pertinent statutory provisions to the Health-General Article. No essential difference in language was made in the process of code revision. For convenience we shall refer to the provisions as they now exist in the Health-General Article.

costs and rates of hospitals, health care institutions, and related institutions located in Maryland. There seem to be virtually no cases from without the State which are helpful in resolving the issues here.

The Commission's powers relative to the controversy here before us are found in § 19–216, which provides: [2]

"(a) *Rate reviewing power.*—The Commission may review costs and rates and make any investigation that the Commission considers necessary to assure each purchaser of health care facility services that:

"(1) The total costs of the facility are related reasonably to the total services that the facility offers;

"(2) The aggregate rates of the facility are related reasonably to the aggregate costs of the facility; and

"(3) The rates are set equitably among all purchasers or classes of purchasers without undue discrimination or preference.

"(b) *Rate approval power.*—(1) To carry out its powers under subsection (a) of this section, the Commission may review and approve or disapprove the reasonableness of any rate that a facility sets or requests.

"(2) A facility shall charge for services only at a rate set in accordance with this subtitle.

"(3) . . .

"(c) *Alternate ratesetting methods.*—To promote the most efficient and effective use of health care facility services and, if it is in the public interest and consistent with this subtitle, the Commission may promote and approve alternate methods of rate determination and payment that are of an experimental nature."

■ Appeals from the Commission, and hence this case, are governed by the Administrative Procedure Act. The pertinent portion of it is now found in Code (1984) § 10–

---

**2.** This power was formerly found in Code (1957, 1980 Repl.Vol.) Art. 43, § 568U from which we quoted in *Holy Cross Hosp. v. Health Services,* 283 Md. 677, 682–83, 393 A.2d 181, 184 (1978).

215(g), State Government Article, from whence it was moved without substantive change from Code (1957, 1982 Repl.Vol.) Art. 41, § 255(f). Sec. 10–215(g) provides:

"(g) *Decision.*—In a proceeding under this section, the court may:

"(1) remand the case for further proceedings;

"(2) affirm the decision of the agency; or

"(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency:

"(i) is unconstitutional;

"(ii) exceeds the statutory authority or jurisdiction of the agency;

"(iii) results from an unlawful procedure;

"(iv) is affected by any other error of law;

"(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

"(vi) is arbitrary or capricious."

■ In *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 390 A.2d 1119 (1978), Judge Eldridge said for the Court, after having quoted the Administrative Procedure Act as it then stood:

" 'Substantial evidence,' as the test for reviewing factual findings of administrative agencies, has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' *Snowden v. Mayor & C.C. of Balto.*, 224 Md. 443, 448, 168 A.2d 390 (1961). The scope of review 'is limited "to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached," ' [citing cases within and without the State, treatises, and law journals].

"In applying the substantial evidence test, we have emphasized that a 'court should [not] substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken.' *Bernstein v. Real Estate Comm.*, 221 Md. 221, 230, 156 A.2d 657 (1959), *appeal dismissed,* 363 U.S. 419, 80

S.Ct. 1257, 4 L.Ed.2d 1515 (1960). We also must review the agency's decision in the light most favorable to the agency, since 'decisions of administrative agencies are prima facie correct,' *Hoyt v. Police Comm'r*, 279 Md. 74, 88–89, 367 A.2d 924 (1977), and 'carry with them the presumption of validity,' *Dickinson-Tidewater, Inc. v. Supervisor*, 273 Md. [245,] 246 [, 329 A.2d 18 (1974)]; *Heaps v. Cobb*, 185 Md. 372, 378, 45 A.2d 73 (1945). Furthermore, not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences. *Labor Board v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106–107, 62 S.Ct. 960 [961], 86 L.Ed. 1305 (1942); *Board v. Levitt & Sons*, 235 Md. 151, 159–160, 200 A.2d 670 (1964); *Snowden v. Mayor & C.C. of Balto., supra*, 224 Md. at 448 [168 A.2d 390]." 283 Md. at 512–13, 390 A.2d at 1123–24. (Emphasis in original.)

The matter of judicial review of an agency decision was put a slightly different way, but to similar effect, by Chief Judge Hammond for the Court in *Insurance Comm'r v. Nat'l Bureau*, 248 Md. 292, 236 A.2d 282 (1967), a case that has been cited and quoted by this Court in a host of cases since then:

"Whichever of the recognized tests the court uses— substantiality of the evidence on the record as a whole, clearly erroneous, fairly debatable or against the weight or preponderance of the evidence on the entire record—its appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence. The required process is difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. There are differences but they are slight and under any of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the

factual conclusion the agency reached. This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment. See 4 Davis, op cit. §§ 29.01, 29.02, 29.03, 29.06, 29.07, 29.10; 2 Cooper, op cit. Ch. XIX, § 7; 2 Am.Jur.2d *Administrative Law* §§ 616, 620, 621, 659, 661; the majority and concurring opinions in *NLRB v. Southland Mfg. Co.*, 201 F.2d 244; *Board v. Oak Hill Farms* [, 232 Md. 274, 192 A.2d 761 (1963),] and *Board v. Levitt & Sons,* [235 Md. 151, 200 A.2d 670 (1964) ]." 248 Md. at 309–10, 236 A.2d at 291–92.

In *Blue Cross v. Franklin Sq. Hosp.*, 277 Md. 93, 113, 352 A.2d 798, 810 (1976), Judge Eldridge said for the Court that the Commission "is empowered to approve that rate structure which it finds to be most reasonable under the circumstances."

[3] We believe, also, that Judge Lowe correctly stated the law for the Court of Special Appeals in *Harford Mem. Hosp. v. Health Serv.*, 44 Md.App. 489, 410 A.2d 22 (1980):

"Since it is the Commission that is empowered to approve *that* rate *structure which it finds* to be most reasonable under the circumstances, even though the Hospital proposal may be reasonable also, the burden to reverse is not to prove an imbalance of reasonableness on the side of the Hospital proposal but rather to negate the reasonableness of the Commission's proposal. The statutory standard which the Commission must apply before approval is not only that rates be reasonable in the light of services and costs, but also that rates be set equitably and without undue discrimination." 44 Md.App. at 498, 410 A.2d at 28 (emphasis in original).

### III

The Hospital first contends that "the Commission exceeded its statutory powers in imposing the guaranteed inpatient revenue system upon the Hospital effective July 1,

1985." [3]  A definition of such a system was set forth for the Court by Judge Davidson in *Health Serv. Cost Rev. v. Lutheran Hosp.*, 298 Md. 651, 472 A.2d 55 (1984):

"According to the Commission, a guaranteed inpatient revenue system (GIR) is a 'diagnostic-based rate-setting approach' 'that is designed to provide incentives to reduce unnecessary or marginal ancillary testing, to reduce length of stay and to promote pre-admission testing,' and is 'Maryland's most promising inflation control methodology' as well as 'the linchpin of the current efforts by the Commission to control hospital costs in Maryland.'

"Before the Commission attempted to impose a GIR, rates for services such as laboratory tests were based upon the price per unit of service.  A GIR, however, establishes an approved rate for the total costs incurred for the treatment of a given patient's diagnosis regardless of the units of service rendered.  If more units of service are provided to a given patient than are covered by the approved rate, the amount of the excess is offset against cases involving similar diagnosis in which fewer services are provided than are covered by the approved rate.  At the end of the fiscal year, a hospital will be denied reimbursement for the aggregate amount of charges in excess of the GIR rate for a particular diagnosis."  298 Md., n. 5, at 659–60, 472 A.2d at 59.

The Hospital contends that the Commission lacks the authority to impose this system because its statutory duty is to determine the reasonableness of costs, not to regulate the quality or quantity of services.  It claims:

"The system ... places a cap on revenues by creating an irrebutable presumption that every class above the cap is medically unnecessary and therefore not reimbursable. It places a limit on the amount a Hospital will be allowed per patient stay without regard to reasonableness of the costs for the total services actually provided."

---

**3.** The Commission order says that "the Hospital shall be placed on the GIR system effective 6/1/85."

Judge Ross said in the trial court on the issue of the guaranteed inpatient revenue system:

"Utilization of the Guaranteed Inpatient Revenue System (GIR) to establish rates is within the power of the Commission. Section 19–216(b)(1) and (c). *Harford Memorial Hospital v. Health Services Cost Review Commission*, 44 Md.App. 489 [, 410 A.2d 22] (1980). The argument that the GIR is beyond the authority of the Commission because the nature of the system is to constrain revenues is without merit. The power to approve or disapprove rates is the power to constrain revenues. Nor is the GIR an unlawful interference with hospital management. It is difficult to see how the power to regulate rates can fail to impact on management decisions. Indeed, the underlying purpose of this regulatory statute would seem to be to require hospital management to become more efficient and to reduce costs. The expert testimony is to the effect that rather than adversely affecting quality GIR not only effectively reduces costs but tends to improve quality. The net of the Hospital's testimony with respect to GIR is that as a method it has imperfections including imperfections in the DRG's [4] upon which the GIR is based. However, there is substantial evidence that this imperfect method works. Furthermore, the evidence is that the system has been and is being improved. The Hospital's contention that GIR restricts introduction of new technology is answered by the inclusion of the 1% of gross revenue and the evidence to the effect that in practice the GIR has not restricted the introduction of new technology."

■ It will be recalled that § 19–216(c) empowers the Commission in an effort "[t]o promote the most efficient and effective use of health care facility services" to "promote and approve alternate methods of rate determination and payment that are of an experimental nature." We

---

4. The term "DRG" stands for Diagnostic Related Groups case-mix studies used in determining rates.

regard the guaranteed inpatient revenue system as falling within that authorization. As Judge Ross indicated, it also falls within the authorization in § 19–216(b)(1) to "review and approve or disapprove the reasonableness of any rate that a facility sets or requests." Moreover, an affirmance on this issue is consistent with the law we have recited in Part II of this opinion.

## IV

The Hospital next contends that the Commission exceeded its statutory powers "in attempting to regulate rates for ancillary services (principally radiology and pathology) furnished and billed to patients by lessees and never included to any extent among the costs of the Hospital." The Hospital says, "It is undisputed that since its establishment in 1975, the Hospital has leased the ancillary services such as radiology and pathology to physicians who have assumed and paid all the expenses and directly billed patients for those services . . . ."

Fees charged to patients by hospital-based physicians such as radiologists and pathologists were held ultimately not to constitute a part of "the total costs of the Hospital" in *Health Services v. Holy Cross Hosp.*, 290 Md. 508, 431 A.2d 641 (1981) (*Holy Cross III*). As we understand it, what is being done here is to regulate the technical component of those ancillary services, not the physician's fees. On this issue the trial judge said:

"While it is true that the Court of Appeals in *Holy Cross Hospital v. Health Services*, 283 Md. 677, at p. 689 [393 A.2d 181] (*Holy Cross I*) held that ' "total costs of the hospital" means the Hospital's expenditures or outlays of money in connection with the operation of the Hospital' it immediately followed the statement of that holding with the statement '[s]ome expenses of a patient's hospital stay traditionally have been included in the bill submitted to the patient by a hospital. For that reason, these expenses would come within the term "total costs of the hospital" as those words are commonly understood,

even if there were to be an attempt on the part of any hospital to enter into an independent contract for those services to be supplied through such hospital to its patients.' There is substantial evidence to support the Commission's finding that the technical component of ancillary services has been 'traditionally ... included in the bill submitted to the patient by a hospital.' Thus, 'these expenses ... come within the term "total costs of the hospital"' even though through its arrangements with the physicians rendering the ancillary services these costs have been physically removed from the Hospital's books. *Health Services v. Harford Memorial Hospital*, 296 Md. 17, [459 A.2d 192 (1983),] does not undermine the rule laid down in *Holy Cross I*. It held that if a hospital incurs as a cost of operating the hospital an expenditure which had not previously been a traditional cost that cost is thus brought within the jurisdiction of the Commission. Thus, while in effect the Commission's jurisdiction can be expanded by placing non-traditional costs on the hospital's books, it cannot be contracted by removing traditional costs."

In *Holy Cross Hosp. v. Health Services*, 283 Md. 677, 393 A.2d 181 (1978) (*Holy Cross I*), immediately after that part of our opinion quoted by Judge Ross, we explained relative to costs traditionally regarded as a part of the "total costs of the hospital":

"For instance, it is known that some hospitals today contract with independent catering firms to supply meal services to hospital patients. We do not think for one instant that it would be possible to remove meal costs from 'total costs of the hospital' so that hospitals might bill patients separately for meals, based upon charges to them of the caterer, and thus to remove such costs from the control of the Commission." 283 Md. at 689, 393 A.2d at 187.

Moreover, in this case there was evidence before the Commission from which it could and did find that the Hospital is the only hospital in the State that leases out its ancillary

departments. Given the bases for review set forth in Part II, we perceive no error.

## V

The Hospital next attacks the application of the Commission's "market basket" methodology. It claims that the rate set on that basis should be reversed "because (A) the 'market basket' methodology was not *prima facie* validated, was vitiated by its demonstrated flaws and was arbitrary and capricious; (B) the 'market basket' was illegally used as an absolute rule; (C) the 'market basket' was used to impermissibly regulate the quality and quantity of services; (D) the Commission illegally and arbitrarily ignored uncontradicted evidence, treated as 'irrelevant' probative evidence it was required to consider, and made findings with no evidence at all to support them; and (E) the Commission's decision was made upon unlawful procedure, in violation of constitutional provisions and is otherwise affected by error of law."

In *Lutheran Hosp.*, n. 2, 298 Md. at 657, 472 A.2d at 58, Judge Davidson defined the term "market basket" for the Court, saying that it "consists of a group of hospitals considered by the Commission to be comparable to the hospital whose rates are being reviewed. The costs of that hospital are compared to the average costs of the market basket."

Two market baskets were used in this case. The Hospital was found wanting when compared to each. The first market basket consisted of a group of hospitals throughout the State selected on the basis of size and scope of services similar to that of the Hospital. The number of beds in those hospitals ranged from a low of 173 to a high of 317. It will be recalled that the Hospital has 240 beds. Only one, Montgomery General, was located in the District of Columbia metropolitan area. One was located in a distinctly rural area. A second market basket was constructed in an effort to meet the objections of the Hospital. All hospitals in the group were located in the same general area as the Hospi-

tal. They ranged in size from a low of 128 beds to a high of 655 beds at Prince George's General.

Despite the Hospital's attempt to cull five or six distinct issues from the Commission's use of the market basket methodology, there is really only one question here: Is use of the methodology within the Commission's power under § 19–216(c)? It will be recalled, once again, that "to promote the most efficient and effective use of health care facility services" the Commission is authorized to "promote and approve alternate methods of rate determination and payment that are of an experimental nature."

Judge Ross said relative to the Hospital's contention:

"There is nothing inherently illegal, capricious or arbitrary about the Market Basket methodology per se. It is a form of peer group comparison. There is expert testimony that peer group comparison is an established and proper tool for hospital rate setting. Also see *Matter of William B. Kessler Memorial Hospital*, [78 N.J. 564,] 397 A.2d 656 (1979). Neither Judge Kaplan nor the Court of Appeals reached this issue in the *Lutheran* case. Use of such a methodology is clearly within the power of the Commission. Section 19–216(c); *Blue Cross v. Franklin Square Hospital*, 277 Md. 93 [352 A.2d 798] (1976); *Health Services Cost Review Commission v. Franklin Square*, 280 Md. 233 [372 A.2d 1051] (1977); *Harford Memorial Hospital v. Health Services Cost Review Commission*, 44 Md.App. 489 [410 A.2d 22] (1980). There is also substantial evidence to support (1) the Commission's decision that the two market baskets selected by Staff were appropriate and (2) the Commission's actual use of those market baskets in determining rates for the Hospital. Credibility of witnesses and the weight to be given their testimony are matters for the Commission.

"The Hospital's myriad objections regarding the Market Basket methodology and its application in this case (which are hopelessly intertwined in its brief) considered singly and together are not persuasive that the Commission's determinations were arbitrary or capricious.

"It is argued the selection of component hospitals is subjective and subject to manipulation to achieve a predetermined result. The evidence is that selection was based on objectively demonstrable similarities. There was no showing that there existed any other group which was composed of hospitals that were more similar or, more importantly, which produced averages which tended to support the Hospital's requested rates. There was no showing of manipulation.

"The fact that the Commission's peer group comparison methodology has been refined from the Market Basket method used in this case to the Inter-Hospital Comparison Group now in use is evidence that the Commission is continuing to improve its methodology. It does not follow that the methodology used in this case is therefore defective.

"It seems clear that with respect to the issue of data error the Commission based its finding on the expert opinion that random errors in large bodies of data do not have a significant impact on averages. The Hospital's expression of indignation with respect to the Commission's reference in its decision to Suburban Hospital is misplaced. The data reporting problem at Suburban related to allocation of charges to particular charge buckets. The testimony was that the total financial data on which the Commission's comparison was based was accurate.

"The Commission did not totally ignore the 'actual costs of the Hospital'. It compared them to the market basket averages and gave the Hospital the opportunity to demonstrate that its higher costs were warranted. The Hospital chose to justify its costs by showing they had been actually incurred and attempting to show all were reasonable and necessary. The net effect was to pit the cost based reimbursement method championed by the Hospital against the disparate peer comparison method uniformly applied by the Commission with the predictable result that the Hospital in large measure failed to explain

by credible evidence why the costs it had actually incurred and anticipated it would incur were so far out of line with those of its peers. There is substantial evidence that the cost based reimbursement method has been discredited and has been displaced by peer comparison which is now widely accepted. The Commission did not arbitrarily apply the Market Basket as an absolute rule but used it as a basis for comparison. It found that the evidence did in part support the Hospital's principal contention that its greater intensity accounted for its higher costs and made adjustments accordingly in establishing the rates."

We agree with Judge Ross that "[t]here is nothing inherently illegal, capricious or arbitrary about the Market Basket methodology per se." It simply sets up an average for purposes of comparison. It is similar to the matterof appraisal of real property. We have said many times that valuation of land is not an exact science. See, *e.g., Mont. Co. Bd. of Realtors v. Mont. Co.*, 287 Md. 101, 110, 411 A.2d 97, 102 (1980); *Supervisor v. Southgate Harbor*, 279 Md. 586, 593, 369 A.2d 1053, 1057 (1977), and *Fairchild Hiller v. Supervisor*, 267 Md. 519, 521, 298 A.2d 148, 149 (1973). Variables are involved. Judgment comes into play. We reject the contention that the Commission arbitrarily applied the market basket averages as an absolute rule and thus violated the requirement of *Franklin Sq.*, 280 Md. 233, 372 A.2d 1051. What the Hospital seizes upon is the statement in that case, "Absolute rules concerning cost factors, applicable to all hospitals under all circumstances, as found in the modified order, are therefore inappropriate." 280 Md. at 241, 372 A.2d at 1055. The market basket methodology imposes no absolute rules concerning cost factors. It is simply a method of comparison. We find Judge Ross to have correctly applied the law to the facts of this case.

## VI

The Hospital asserts, "The Commission's decision disallowing reasonable fair market rental value of the Hospital

building as a cost was arbitrary and capricious, in violation of the Commission's own regulations and guidelines and beyond the Commission's statutory power." As we have indicated, the joint venture owns the hospital building which it leased to the Hospital in 1975. At that time the rental was set at $1.4 million. The Hospital says this was "on the basis of an arm's length fair rental value determination made by ... a real estate firm in Washington, D.C." It further states that the "lease provides for a Consumer Price Index escalation clause as was usual in 1975 for arm's length leases." The actual rental under the lease at the time of the hearing, according to the Hospital, was $3,055,-700 which together with $173,600 in real estate taxes amounted to a total of $3,229,300 payable under the lease. The Hospital concedes that the "escalation clause turned out to overcompensate for inflation." It says that an independent appraiser who testified for the Hospital appraised the fair market rental value as of April 1982 at $2.33 million "with a tolerance of not more than 20%."

The trial judge said on this issue:

"The decision of the Commission to allow actual depreciation, actual mortgage interest and actual taxes incurred for the annual cost of the physical plant is neither arbitrary nor prevented by law. There is substantial evidence that this is an appropriate method for hospital rate setting. It is used for Medicare reimbursement and has been used consistently by the Commission in setting rates for other hospitals. Even if it were assumed that the Hospital's proposed method of using actual costs of the lease was a reasonable one, the Commission is not required to accept it. *Harford Memorial Hospital, supra.* The Commission did not arbitrarily apply the methodology to the Hospital but considered the evidence submitted by the Hospital and the arguments made on behalf of the Hospital. Although the Commission referred to the Medicare waiver, it based its decision on its consideration of all of the evidence on the issue."

In support of its position the Commission points to *Potomac Edison Co. v. PSC*, 279 Md. 573, 580, 369 A.2d 1035, 1040 (1977), where this Court stated that it "is appropriate to consider the underlying capital structure of the system in any parent-subsidiary situation." In that case, Potomac Edison had recommended a rate of return on investment of 9.9%; People's Counsel countered with a recommendation of 8.5%. The Public Service Commission adopted the hearing examiner's finding that 8.6% would be a fair rate of return. We said, "Our inquiry ... is limited to a determination of whether there was illegality or unreasonableness in the commission's action; when that inquiry is finished, judicial scrutiny ends and the judicial function in the rate making process is over." 279 Md. at 582, 369 A.2d at 1041. That the adopted rate of return was closer to one party's recommendation than to the other's "does not remove the commission result from the zone of reasonableness. What matters above all else is that there was substantial evidence to support it." 279 Md. at 583, 369 A.2d at 1042. See our discussion in Part II of this opinion.

██ The Hospital argues that real estate taxes of $194,-052, which seem somehow to have been overlooked in calculations, should be added and that this is cause for remand. It must be borne in mind that the Hospital requested a rate which would generate in excess of $41.5 million in gross revenue and that the final rate allowed would generate $35.1 million in gross revenue. We regard this error as de minimis, particularly, as set forth in Part XI of this opinion, when one considers that the total sum of overcharges and interest is $15.541 million. We see no ground for reversal on this point even when considered with the $98,700 discussed in Part IX.

## VII

██ The Hospital claims that the "Commissions disallowance of lease payments on equipment leased from third party lessors and straight line depreciation on owned equip-

ment (Issue No. 6 [in the trial court]) and the Commission's disallowance of depreciation on capital intensive equipment (Issue No. 9) should be reversed for the same reasons set forth in [Part V pertaining to market baskets] and the requested depreciation and lease payments should be allowed as costs to the hospital."

It explains:

"Issue No. 6 involves the Hospital's request to include in its rates lease payments to third party lessors ... and straight line depreciation on owned equipment.... Issue No. 9 involves depreciation on capital intensive equipment. In each case the Commission rejected as irrelevant the actual lease payments ... and the evidence as to their reasonableness ... and also rejected as irrelevant the evidence of reasonableness of requested straight line depreciation based upon cost and useful life. Instead it determined the amount allowable on the basis of market basket averages for equipment costs and depreciation.... The market basket average was measured in terms of $905.00 per average occupied bed and this average was multiplied by the average occupied beds of the Hospital.

"The Hospital's evidence, rejected as irrelevant, included testimony that all leases except those entered into in 1980–1981 were reviewed in 1975, 1976 and 1977 by Medicare and after extensive analysis Medicare approved leases because, in Medicare's judgment, the lease expense was equivalent to depreciation that would have been allowable if the Hospital had been the owner.... The Commission stated ... that Medicare approval of the leases does not constitute approval of the amount of lease payments. This is in direct contradiction to the Commission's treatment of P[re]F[iled item] 1114 as irrelevant.... The Commission held it to be irrelevant that the reason why Medicare approved the leases was that Medicare found the amounts to be reasonable even under its very strict standards. How it could hold this evidence irrelevant under the circumstances is inexplicable."

On Issues 6 and 9 Judge Ross said:

"These issues relate to the Commission's reliance upon the market basket methodology. The Hospital has failed to demonstrate that the Commission's decision that the Hospital failed to meet its burden of proof with respect to justifying the excess of its costs over the market basket average was not arbitrary and capricious."

We agree.

## VIII

The Hospital claims that the Commission acted arbitrarily and capriciously in determining its net equity and rate of return. It makes four arguments within one here: (1) The Commission failed to give any weight to reproduction costs or current value in assessing the Hospital's assets, basing its assessment instead on the original cost method; (2) the Commission based its allowance for rate of return on the stockholders' equity rather than the fair value of the Hospital's assets; (3) the Commission allowed only $200,000 for working capital, despite substantial evidence that the allowance should have been $3,750,000; (4) the Commission should have allocated 87% of the value of the land, rather than just 80%, to the Hospital; and (5) the determination of working capital was arbitrary because the Commission's expert was not as qualified as the Hospital's.

On the other hand, the Commission and Group Hospitalization contend that the net original cost methodology used here to determine the allowable return on equity has been used for every other hospital in Maryland. They further assert that witnesses for both sides testified that it was the proper methodology. They claim experience at other hospitals has shown that the allowed rates will be sufficient to attract capital. Furthermore, they assert that the final rate approved for the Hospital was much higher than that for a comparable proprietary hospital. Finally, they contend the Commission's allowance of $200,000 for working capital was based on the most favorable end of a range of working capital needs testified to by a Commission expert.

The Commission's expert estimated the working capital needs at anywhere from $200,000 to negative $800,000. The Commission adopted the end of that range most favorable to the Hospital. For an out-of-state case involving a regulatory agency's allowance for working capital, see *In re Barnert Memorial Hospital Rates*, 92 N.J. 31, 455 A.2d 469 (1983).

Neither Judge Ross nor the Commission's brief addresses the argument relative to the allocation of 87%, rather than just 80%, of the value of the land on which the hospital complex is located. The argument does not appear to be supported by the record. The Commission, in finding that an independent appraisal should be made of the value of the land, merely stated that estimates in the testimony placed the Hospital's share at approximately 80%; the Hospital was then directed to supply data for determining how to pro-rate the land's value.

The principal issue here, like the one involving the guaranteed inpatient revenue system, involves statutory construction. Section 19–217(d)(2)(ii) of the Health-General Article mandates the Commission to permit proprietary hospitals to charge rates that "[b]ased on the fair value of the property and investments that are related directly to the facility, include enough allowance for and provide a fair return to the owner of the facility." The Hospital says the method used to assess the "fair value" of the property and investments does not permit a fair return; the Commission says it does.

The methodology in question involves valuation based on the "net original cost"—i.e., according to the Commission, "the value of the property at the time it was dedicated to hospital use, less depreciation and debt." The Hospital contends that the use of this method was improper because of the legislative history of § 19–217(d)(2)(ii), the case law, and the lack of substantial expert testimony.

Judge Ross said relative to this set of contentions:

"The Hospital's contention that the legislative history of § 19–217 precludes the use of the original cost method to determine fair value is unsound. The original statute required inclusion of 'an allowance for a fair return to stockholders based upon actual investment or the fair value of the investment whichever is less'. Senate Bill 682, 1972, sought to amend this provision to read 'based upon actual investment or the current fair market value'. The bill was amended in the legislative process to delete both 'actual investment' and 'current fair market value' so that as enacted in Chapter 681, Laws 1972, it read 'based upon fair value'.

"The term 'fair value' has a long history in Maryland Public Service Commission law as well as in rate laws and cases in other states. A realistic reading of the cases shows that its meaning has undergone a metamorphosis in the Maryland Public Service Commission law. In *Havre de Grace Bridge Co. v. Public Service Commission*, 132 Md. 16, 29 [, 103 A. 319, 323] (1918), it was held to mean not the original cost of acquisition 'but what was its fair value at the time of the investigation by the Commission'. Thereafter, for some years the Public Service Commission utilized present value rather than original costs. *Public Service Commission v. United Railways Co.*, 155 Md. 572, 579, 602 [, 142 A. 870, 872, 881] (1928). In *C & P Telephone Company v. Public Service Commission*, 201 Md. 170 [, 93 A.2d 249,] (1952), it was recognized that in determining fair value no particular formula must be adopted nor must controlling effect be given to reproduction costs as compared to original costs. The issue in that case was whether the Commission had failed to give adequate weight to reproduction costs. The difference between the Commission's finding of depreciated original cost and the company's evidence as to depreciated reproduction cost was $25,227,080. The Commission allowed $3,060,139 (12% of the company's request) in excess of original cost. The court held it could not find

that the Commission had failed to give proper consideration to the evidence of reproduction cost.

"In *C & P Tel. Co. v. Public Service Commission*, 230 Md. 395 [, 187 A.2d 475] (1963), it is disclosed that fair value had been determined in subsequent cases, including the one before the Court, by adding the same figure of $3,060,139 to the net book value of the assets. The court referred to expert testimony to the effect that a fair and reasonable rate of return should be based upon net book value. The company argued that the Commission had applied erroneous theories of law because it stated in its opinion that 'the use of a readily measurable and factually determinable net original cost rate base leaves only one judgment figure or variable, that is, the rate of return, and ... that the determination of a rate arrived at by the use of trended costs or reproduction costs would allow the company a return on dollars never invested'. 230 Md. at 395 [187 A.2d 475]. The court refused to reverse on that ground but explained that the statements should be read as expressions of the reasoning which motivated the Commission in determining what weight to give to current appraisal evidence rather than meaning that the Commission did not find fair value or in so doing gave no weight to the evidence of current value. It held that the Commission's action was not arbitrary, capricious, unsupported by substantial evidence or otherwise affected by error in law. See also *Potomac Edison Co. v. Public Service Commission*, 279 Md. 573 [, 369 A.2d 1035] (1977) and *Public Service Commission of Maryland v. Baltimore Gas & Electric Co.*, 273 Md. 357 [, 329 A.2d 691] (1974). In his prefiled testimony Richard J. Lurito expressed the opinion that '[i]n Maryland, fair value is simply equal to net original cost'. While this statement of an economist, who admitted on cross-examination he was not familiar with Maryland Public Service Commission law in its entirety, cannot be accepted as an authoritative statement of Maryland law, it cannot be said that it is an unfair statement in light of the cases just discussed

and cited. It seems clear from the expert testimony in this case and that referred to in *C & P Tel. Co. v. Public Service Commission, supra,* that prevailing economic theory is that the proper way to compute fair return on fair value is to use net original cost without adjusting for increased cost of construction or other factors bearing on the current value of the assets. At most all that Maryland law requires is that the regulatory agency consider evidence as to such factors, not that it accept it in whole or in part.

"In view of the rejection of 'current fair market value' by the General Assembly in Chapter 681, 1972, the general intent of the legislature in enacting Subtitle 2 of Title 19 and the evolution of the meaning of 'fair value' in Maryland Public Service Commission law, it seems that the General Assembly intended to give the Health Services Cost Review Commission sufficiently broad power in determining fair value to use net original cost without adjustment. There is substantial expert evidence in this case that the use of net original cost is proper for rate making purposes and that the impact of inflation is recognized in the rate of return.

"There is substantial evidence to support the Commission's methodology and its application in setting the rate of return on the rate base and the assets. Limiting the amount allowed for the addition to the building in the calculation of total assets to the amount approved in the application for certificate of need if not mandated by §§ 19–114(g) and 19–217(e), is certainly authorized. The evidence supports the Commission's conclusion that neither Staff nor the Hospital had properly computed the Hospital's working cash capital. The burden of proof was on the Hospital and in light of its failure to meet the burden the Commission was justified in relying upon the expert opinion of Dr. Lurito.

"The Commission's decision is flawed to the extent that it directs Staff to develop a proper method for determining working cash capital and to recompute the value of

the land and the portion allocable to the Hospital on the basis of future appraisal and submission of additional evidence by the Hospital. § 19–219(f). There is substantial evidence to support the valuation and allocation which the Commission made in its decision on the basis of available evidence. The Commission's concern that the valuation is too high and the allocation too great can only be addressed by a future review of the rates pursuant to its authority under § 19–216(a). See *Health Services Cost Review Commission v. Lutheran Hospital of Maryland, Inc., supra,* footnote 11. These items require findings of fact. The Commission's direction to Staff to update the market basket averages based on current data is distinguished because it relates to a valid methodology approved by the Commission in this decision and thus there is no delegation of future fact finding."

We reject the Hospital's contentions.

## IX

The Hospital contends that the Commission's decision denying it an allowance of $98,700 for short-term interest on borrowed funds should be reversed because it is based on the Commission's demonstrable misapprehension of fact. It claims it requested $98,700 for short-term interest on operating funds which it was required to borrow because of its inability to receive rate relief from the Commission over an extended period of time. It says, "As the Commission's findings indicate, the Hospital submitted evidence as to the amounts of the loans, the persons to whom they were payable and the purposes for which all but $20,000 of the total credit of $910,000 was used."

On this issue the trial judge said:

"On the basis of the evidence before it, the Commission was neither arbitrary nor capricious in finding that the Hospital had failed to demonstrate the need for inclusion of $98,700 for interest on short-term borrowing for operating funds. The Hospital's argument in its brief that

the Commission directed non-allowance of the 2% of level IV gross revenue for working capital, which is automatically included under Commission methodology, is incorrect. The direction to Staff in F.40B of the Commission's decision relates to computation of cash working capital for inclusion in the rate base."

The Commission confesses in this Court that it erred in stating that it had no documentation of any of the loans. We simply do not regard the failure to include approximately $99,000 in outlay here as a ground for reversal. The rate allowed generated income of $35.1 million annually while what was sought was $41.5 million annually. This is just too small an error in proportion to the total to require reversal, even when considered with the $194,052 discussed in Part VI of this opinion. We noted in Part VI in considering the amount there involved as de minimis that in addition to weighing it alongside of the allowed income and the income sought that we also considered, as pointed out in Part XI of this opinion, that the total sum of overcharges and interest is $15.541 million.

## X

The Hospital claims that the Commission and the Circuit Court for Baltimore City erred in disallowing the Hospital's request for a one-time special addition to rates to make up revenues of which the Hospital says it was wrongfully deprived by the Commission's refusal to grant routine inflation adjustments in 1979, 1980, and 1981 "as 'punishment' for the Hospital's failure to supply information the Commission had no right to demand." It sought a special rate adjustment of $5.6 million. It claims that the fact it may have made a profit during that period is immaterial. It further asserts that it did exhaust its administrative remedies.

The Commission contends that the Hospital's arguments should be rejected because it failed to exhaust available administrative remedies after its temporary rate applications were denied and that it did not qualify for rate relief

both because it had earned profits in excess of $500,000 and because the figures it submitted were not in accord with the Inflation Adjustment System.

On this issue the trial judge said:

"This issue highlights the Hospital's stubborn adherence to its legal positions and its insistence that things be done its way and only its way evidence of which permeates the record and the briefs filed by the Hospital. The Hospital, of course, is at perfect liberty to dispute the Commission's legal position and challenge its procedures. However, there is a clearly stated administrative remedy for this purpose, that is, to request a permanent rate change under § 19–219(a). The Hospital's argument at the hearing that it did not do so because it knew its request would be denied begs the question. Inflation adjustments and temporary rate changes are not mandated by law and the Hospital may not demand them as a matter of right. The Hospital's request for restitution on equitable principles has no merit. There is no equitable principle that provides for restitution to a party who has failed to avail itself of available remedies. The consequences of its election as to course of conduct must be borne by the Hospital and its owners and not the Hospital's patients. Furthermore, and more importantly, the Commission's order permits the Hospital to retain the better part of the excess of charges over Commission-approved rates resulting from Judge Grady's orders and the Commission's 10% interim increase which goes a long way towards allowing the Hospital rates comparable to those it would have received had it been granted full inflation adjustments."

We reject this contention for the reasons stated by the trial judge.

## XI

The Hospital and Group Hospitalization each contest the implementation. For a proper understanding we must detail a bit more of the facts.

On February 20, 1981, the Hospital submitted a permanent rate application to the Commission. It sought a 25.53% increase in its unit rates. This application was made in accordance with an order of the Baltimore City Court dated December 23, 1980, in which Chief Judge Grady issued an ex parte order granting the Hospital a temporary rate increase of 13.8% in unit rates pending a review of a full rate application to be submitted by it within sixty days. The court order further stipulated that the temporary rate increase was to remain in effect until the Commission issued a final rate in the proceedings and that the final rate would be retroactively adjusted by the Commission to November 30, 1980, if the rates implemented as a result of the court's order were ultimately determined by the Commission to be excessive.

The Commission unilaterally passed an order on December 7, 1981, granting the Hospital a 10% increase in its rates in order that it might not be penalized momentarily for having participated in good faith negotiations with the Commission. On March 30, 1982, the Hospital obtained an additional rate increase from the Baltimore City Court through Chief Judge Grady. This was in the amount of 4.39%.

On April 28, 1982, the Hospital filed an amended rate application based on fiscal 1981 data. It sought approval from the Commission for rates in excess of $41.5 million, which the Commission found to be a 50% increase.

The Hospital filed a declaratory judgment action in the Baltimore City Court. Chief Judge Grady determined on September 16, 1982, that the Hospital's amended filing of April 28 triggered the 150-day review process set forth in § 19–219, Health-General Article, and that as of September 28 the Hospital could implement the rates requested in its amended rate filing.

On October 5, 1983, the Commission issued a proposed opinion which was distributed to all interested parties. Its final decision was rendered on November 4, 1983. The

following is contained within the implementation portion of its decision:

"While the evidence presented supports rates 2% above the Market Basket averages, the Hospital's requested rates are 71% above Market Basket I and 64% above Market Basket II. These rates are clearly far in excess of reasonable rates justified by the evidence and have been in effect since September 1, 1982 by operation of law.

". . . [T]he Commission recognizes that immediate imposition of *appropriate* underlying rates would cause a drastic reduction in income to the Hospital. It is recognized that the Hospital is not entitled to the excessive revenue it has been receiving, but its cost structure could not immediately absorb an abrupt reduction to a level of reasonable rates.

∗ ∗ ∗ ∗ ∗ ∗

". . . Since the Hospital's rates prior to implementation of requested rates were approximately 13% above its peers, the entire amount of increase was unwarranted and must be *returned prospectively* over 20 months . . . . [The Hospital is permitted] to retain any interest it earned on the excessive rates during the 13 months they were in effect. . . .

"In being lenient towards the Hospital in this order, the Commission does not require repayment of interest earned (estimated at $1,850,000) on the excess charges for the period 9/28/82–6/30/85 (an amount which represents non-operating income to the Hospital), nor on the amount of overcharges or interest thereon calculated in accordance with Judge Grady's order for the period 12/1/80 to 9/28/82, estimated by the Staff at approximately $13,-691,000.00, a total of $15,541,000." (Emphasis added.)

The Hospital contends that the order is confiscatory, constitutes retroactive rate-setting, and sets rates far into the future on the basis of evidence having no reasonable relationship to the rates set and without giving the Hospital

the procedural protections to which it is statutorily and constitutionally entitled.

Group Hospitalization claims that the trial court erred in affirming the Commission decision which required only prospective repayment, without interest estimated at $1.85 million, for unreasonable overcharges from September 28, 1982, to June 30, 1985. It further claims the court erred in affirming a Commission decision which, on grounds of "leniency," failed to require repayment of unreasonable overcharges or interest, in the amount of $13.691 million, for the period December 1, 1980, to September 28, 1982, and permitted existing rates to continue to June 30, 1985. It is said that the total sum of overcharges and interest is $15.541 million.

On implementation Judge Ross said:

"The Hospital's contention that the Commission's power is circumscribed by the budget year of the data it chose to submit in support of its amended application is specious. The Hospital may only charge Commission-approved rates. The latest previous general rate approval order was in 1978. The rates ordered by Judge Grady were expressly made subject to refund in the event that the Commission's determination of final rates showed they were excessive. The methodology employed by the Commission is within the power granted it in § 19–216(c) and is consonant with § 19–219(f).

"For purposes of clarity it is observed that as alluded to above, this consolidated appeal is a separate and distinct action beginning with the filing of the orders of appeal from the final decisions of the Commission. It is not necessary to determine how many independent actions are contained in the court file. See Judge Grady's order December 23, 1980. Thus, the binding effect of Judge Grady's several unappealed orders, which are not orders in this administrative appeal, emanates from *res judicata* and not the law of the case as suggested by the parties.

"The authority to utilize in calculating refunds an annualized revenue figure less than the $33,752,000 stated in Judge Grady's order of March 30, 1982 is contained in the final paragraph of that order. The Commission's order of September 24, 1982 is contained in the final paragraph of that order. The Commission's order of September 24, 1982 did no more than make it clear that the entirety of the requested rates which went into effect at the end of the 150-day period were subject to the refund provisions of § 19–219(e). That order cannot be fairly read as a final decision that any refund would be calculated on the basis of the rates granted in Judge Grady's order rather than in accordance with his orders.

"While [Group Hospitalization's] contentions with respect to refunds, which were presented with force and clarity, are not unpersuasive, it cannot be said that the Commission's decision with respect to refund is beyond its power or is arbitrary and capricious. It is true the method used by the Commission in calculating the rates for the several years in question utilized an adjusted market basket average which it designated as a reasonable rate. However, the net effect of the total decision, which involved adjustments including forbearance of requiring refunds, was to establish what the Commission deemed to be reasonable rates for each of the years in question. The Commission indicated the adjustments were necessary to comply with its duty under § 19–217(d) to permit reasonable rates that provide a fair return to the Hospital. In effect, the Commission granted varying rates during an interim period to allow the Hospital to alter its cost structure to accomodate an ultimate rate structure substantially lower than that which the Hospital had requested and that for which its existing cost structure had been designed. Its decision is not without rational basis nor beyond its statutory mandate.

"There is substantial evidence to support the conclusion that the rates set by the Commission are not confiscatory and do not threaten the solvency of the Hospital. The

statute does not require the Commission to guarantee the solvency of a hospital. It merely requires that the rates be set in such a manner that the hospital can be operated on a solvent basis and, if proprietary, receive a fair return on fair value of its assets. There is substantial evidence that the rates approved by the Commission will permit this hospital to be so operated, if it is operated efficiently. Acceptance of the Hospital's contention that the Commission must approve rates which would assure solvency and a fair return on the basis of the Hospital's actual costs or projected actual costs would defeat the purpose of the statute."

Our reasoning is similar on both appeals. Hence, before addressing the issue of Group Hospitalization's appeal we must take up the contention made by the Hospital concerning that appeal. It argues that Group Hospitalization is precluded from attacking the implementation portion of the final decision because it failed to preserve the issue during the proceedings before the Commission. The Hospital claims, citing *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 519–20, 390 A.2d 1119, 1127 (1978), that to the extent that the alleged procedural and evidentiary errors were not raised before the Commission, Group Hospitalization may not raise them for the first time in a judicial review proceeding. However, the objection which Group Hospitalization is raising on appeal here is one stemming from the ultimate and final decision of the administrative agency. It is not an objection concerning an evidentiary or procedural matter to which objection could have been made during the course of the administrative proceeding; rather, it is simply an appeal by an aggrieved party of a final decision of an administrative agency.

What Group Hospitalization is presently objecting to is the prospective repayment over a twenty-month period of excess rates charged by the Hospital for the thirteen-month period from October, 1982, to November, 1983; the Commission's failing to require repayment of interest earned on the excess charges for the period October, 1982, through June,

1985; its failing to require the repayment of overcharges and interest thereon for the period December, 1980, through September, 1982; and its continuance of existing rates to June 30, 1985.

At no other time throughout the course of this entire proceeding did Group Hospitalization have an opportunity to object to the Commission's decision not to require repayment of overcharges and interest thereon for the period December, 1980, through September, 1982. However, concerning the Commission's decision to provide for prospective repayment of overcharges for the period October, 1982, to November, 1983, its decision to allow the Hospital to retain interest earned on the excessive rates in effect during the above thirteen-month period, and its decisions as to the effective date of the rates, Group Hospitalization was given an opportunity to file written exceptions to the above Commission decisions, by virtue of their being included in the proposed opinion issued on October 5, 1983. Because Group Hospitalization's complaint here pertains to the Commission's action, not to evidentiary or procedural error, it may raise its objections for the first time on judicial appeal.

In Part II we have already set forth principles pertaining to judicial review of administrative decisions. We add that in *Annapolis v. Annap. Waterfront Co.*, 284 Md. 383, 395, 396 A.2d 1080, 1087 (1979), Judge Cole said for the Court that we adhere "to the proposition that a reviewing court will not substitute its judgment for that of an administrative board where the issue is fairly debatable and the record contains substantial evidence supporting the administrative decision."

In the context of the review of an order from a federal administrative agency Chief Justice Hughes said for the Court in *Ford Motor Co. v. Labor Board*, 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221 (1939):

"It is familiar appellate practice to remand causes for further proceedings without deciding the merits, where

justice demands that course in order that some defect in the record may be supplied. Such a remand may be made to permit further evidence to be taken or additional findings to be made upon essential points. So, when a District Court has not made findings in accordance with our controlling rule (Equity Rule 70½) it is our practice to set aside the decree and remand the cause for further proceedings. The jurisdiction to review the orders of the Labor Relations Board is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action. The purpose of the judicial review is consonant with that of the administrative proceeding itself,—to secure a just result with a minimum of technical requirements." 305 U.S. at 373, 59 S.Ct. at 306–07, 83 L.Ed. at 229–30.

This was applied in *Indiana & Michigan Electric Co. v. Federal Power Com'n,* 502 F.2d 336 (D.C.Cir.1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975), where the court, before quoting from *Ford Motor Co.,* said, "A court sitting in review of an administrative agency is vested with equity powers which it may employ in a manner defined by the Supreme Court in Ford Motor Co. v. NLRB ...." 502 F.2d at 346.

It must not be forgotten that the Hospital urged us to stay the order of the trial court, contending that implementation of that order would have dire effect on the Hospital financially and might push it over the brink into bankruptcy. We suggest that under the circumstances existing here it was entirely reasonable for the Commission to require only prospective repayment of unreasonable overcharges, for this to be done without interest, and to permit existing rates to continue to July 1, 1985.

We have set forth in Part II of this opinion the standard for review of appeals from administrative agencies such as the Commission. We have noted that courts will not substi-

tute their judgment for the expertise of the agency. We have mentioned that the agency's decision is to be reviewed in the light most favorable to the agency because decisions of administrative agencies are prima facie correct. We have pointed out that the Commission is empowered to approve that rate structure which it finds to be most reasonable under the circumstances. Applying the rules for review of administrative agencies which we have discussed in Part II and bearing in mind that a reviewing court will not substitute its judgment for that of an administrative agency where the issue is fairly debatable and the record contains substantial evidence supporting the administrative decision, we find no error in implementation.

JUDGMENT AFFIRMED; APPELLANT TO PAY ITS OWN COSTS INCLUDING COSTS OF RECORD EXTRACT; CROSS–APPELLANT TO PAY ALL COSTS OF APPELLEES.