993 F.2d 228
 Medicare & Medicaid Guide P 41,408
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
PGDH LIQUIDATING TRUST, as successor in interest to Prince
George's Hospital, Incorporated, t/a Doctors'
Hospital of Prince George County,
Plaintiff-Appellant,
v.
Louis W. SULLIVAN, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 92-2068.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 3, 1993
Decided: May 7, 1993
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Walter E. Black, Jr., Chief District Judge. (CA-90-3316-B)
 H. Lane Kneedler, Hazel & Thomas, Richmond, Virginia, for Appellant.
 Javier Armando Arrastia, Assistant Regional Counsel, Office of the General Counsel, Department of Health and Human Services, Philadelphia, Pennsylvania, for Appellee.
 Arvin E. Rosen, William L. Siskind, Siskind, Burch, Grady & Rosen, Baltimore, Maryland; Leslie H. Wiesenfelder, Dow, Lohnes & Albertson, Washington, D.C., for Appellant.
 Charlotte Hardnett, Acting Chief Counsel, Region III, Office of the General Counsel, Department of Health and Human Services, Philadelphia, Pennsylvania; Richard D. Bennett, United States Attorney, Larry D. Adams, Assistant United States Attorney, Baltimore, Maryland, for Appellee.
 D.Md.
 AFFIRMED.
 Before HAMILTON and WILLIAMS, Circuit Judges, and MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 PGDH Liquidating Trust, the successor in interest to Prince George's Doctors' Hospital, appeals the decision of the district court affirming the judgment of the Provider Reimbursement Review Board (PRRB).[1] The PRRB held that PGDH was not entitled to any additional Medicare reimbursements. Finding no error, we affirm.
 
 
 2
 * This case involves a challenge to the interpretation of one of the many complex provisions in the Medicare Act by the Secretary of Health and Human Services (Secretary). Thus, it is helpful for our discussion to begin with an outline of the relevant statutes before discussing the specific facts of this appeal.
 
 
 3
 * The General Medicare Program
 
 
 4
 Medicare is a two-part health insurance program enacted to reimburse the cost of covered medical services provided to eligible elderly and disabled individuals. Prior to major legislative reforms in 1982 and 1983, Part A of the program paid the "reasonable cost" of inpatient hospital services and related post-hospital medical services provided to qualified individuals. Under this system, hospitals would receive payment from Medicare after incurring and billing Medicare for their costs. Part B paid for supplementary benefits for other medical charges, including physician fees, on a "reasonable charge" basis.
 
 
 5
 Under the pre-1982 system, a hospital was required to furnish the ancillary services that are customarily billed along with room, board, and nursing care. For example, radiology, pathology, and nuclear medicine fell within the definition of "ancillary services." Such ancillary services consisted of a professional component (e.g., physician's fee for interpreting an x-ray) and a technical or non-physician component (e.g., the overhead, personnel, and equipment necessary to take an x-ray). When the hospital directly supplied the technical component, Part A applied to determine the amount for which Medicare would pay the hospital for these services.
 
 
 6
 Before the 1982 and 1983 reforms, hospitals often entered lease arrangements with third parties which allowed those third parties, in return for a lease payment, to provide ancillary services to hospital patients.[2] Under the pre-1982 Medicare system, if the lease required the outside supplier to assume all or most of the costs for supplying the technical component of these ancillary services, Medicare would reimburse the third party for these costs under Part B. Thus, if the outside suppliers operated under such a lease arrangement, Medicare paid them for both the technical and professional components of ancillary services which they provided to hospital patients. Leasing the technical component to outside suppliers became known as "unbundling."
 
 
 7
 In addition, the pre-1982 Medicare system also reimbursed outside suppliers under Part B for the amounts which the outside suppliers paid to the hospital under the lease arrangement. Because of this reimbursement, the hospitals could inflate the lease charges without much resistance from outside suppliers. Thus, Medicare was the only party harmed by these lease arrangements.
 
 
 8
 Partly in response to this exploitation by hospitals, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) and the Social Security Amendments of 1983. These statutes and their implementing regulations limited the scope of Part B to reimburse outside suppliers only for their own professional fees. Thus, the new laws required hospitals to "rebundle" the costs for providing the technical component of ancillary services by allowing only the hospital to seek reimbursement for these costs under Part A.
 
 
 9
 In addition, because the old formula for reimbursing hospitals under Part A created little incentive for hospitals to contain their costs, Congress also changed the formula for reimbursing hospitals under Part A. Specifically, Congress replaced the"reasonable costs" formula with a prospective payment system. Under this new system, Medicare now makes prospective, periodic payments to hospitals at fixed prices, which are determined by placing the patients' medical conditions into particular diagnostic-related groups (DRG). Thus, in effect, Medicare now pays hospitals a predetermined sum based on the particular diagnosis for any given patient. These predetermined amounts include payments for the technical component of ancillary services because, as mentioned above, the hospitals can no longer allow outside suppliers to bill Medicare for these costs.
 
 
 10
 Because of these significant changes in the Medicare program, Congress recognized that some hospitals who relied heavily on outside suppliers might need time to adjust their billing practices. Therefore, Congress included a waiver provision in the 1983 Amendments. This waiver, referred to as a "Section 602(k) waiver," delayed the rebundling requirement for up to three years for qualifying hospitals.
 
 
 11
 To qualify for this waiver, a hospital had to satisfy two requirements. First, the outside suppliers' reasonable charges for the nonphysician services had to amount to at least 125 percent of the reasonable cost of the non-physician ancillary services furnished by the hospital.[3] Second, the hospital had to demonstrate that its inpatients received at least three types of ancillary services-such as pathology, radiology and physical therapy services-primarily from outside suppliers.
 
 
 12
 If the hospital qualified for the waiver, then its outside suppliers could continue billing for the technical component of ancillary services provided. Consequently, Medicare would continue to pay a qualifying hospital's outside suppliers for the technical component under Part B. However, the waiver provision did not affect the newlyenacted, prospective DRG payment system to hospitals under Part A. Thus, under the waiver, Medicare paid the hospital (under Part A) and the outside suppliers (under Part B) for the same technical services. In order to adjust for this double payment under Parts A and B for the same services, Congress added an offset provision to the waiver. This offset provided, in relevant part, that:
 
 
 13
 Any such waiver shall provide that such billing may continue to be made under Part B of such title but that the payments to such hospital under Part A of such title shall be reduced by the amount of the billings for such services under Part B of such title.
 
 
 14
 Pub. L. No. 98-21, 97 Stat. 65 § 602(k). In other words, Medicare reduced a hospital's overall prospective Part A payments by the amount which it paid the hospital's outside suppliers under Part B for the technical component of ancillary services.
 
 B
 The Maryland Medicare Program
 
 15
 The Medicare system of reimbursement in Maryland differed in one respect from the general system previously described. Specifically, Maryland obtained a demonstration waiver from the Secretary, allowing it to establish its own method for reimbursing hospitals under Part A. See, Terms And Conditions (of Maryland's Demonstration Project), Joint Appendix (J.A.) at 58:
 
 
 16
 Medicare ... principles of reimbursement are to be waived with respect to hospitals participating in the [rate setting] experiment.... During their periods of participation, such hospitals shall be paid for covered services furnished to Medicare and Medicaid patients according to payment methodologies developed and promulgated by [Maryland].
 
 
 17
 Under this demonstration project, Maryland's Health Services Cost Review Commission (HSCRC) established its own rates and prospective payment system for reimbursing hospital expenditures under Part A. However, Maryland's system did not address Part B principles of reimbursement.
 
 
 18
 A major dispute arose between PGDH and the HSCRC regarding the reach of these HSCRC rates. Specifically, because Maryland's demonstration project only regulated hospital rates, PGDH believed that the HSCRC rates could not regulate the charges for the technical component of ancillary services provided by outside suppliers. However, in January 1985, the Maryland Court of Appeals rejected PGDH's claim in Prince George's Doctor's Hospital, Inc. v. Health Services Cost Review Commission, 486 A.2d 744 (Md. 1985), holding that the HSCRC rates applied to the technical component of ancillary services regardless of who supplied the services.
 
 C
 Particular Facts of this Appeal
 
 19
 After Congress enacted the Section 602(k) waiver, PGDH applied to the Secretary for the waiver on August 22, 1983. The Secretary originally denied this request because the bills submitted by PGDH's outside suppliers to Medicare failed to "separate ... charges into professional and technical components." J.A. at 97.[4] Thus, the Secretary could not determine whether PGDH satisfied the 125 percent test.
 
 
 20
 After several rounds of negotiations, PGDH responded to the Secretary's concerns by submitting two schedules which allocated a percentage of its outside suppliers' total billings attributable to their charges for the technical component of ancillary services. Specifically, Schedule I was based on the estimated percentages of each outside supplier's annualized charges which represented the technical component for Medicare inpatients of PGDH. Schedule II estimated these same charges based on statewide averages developed by PGDH's consultants. Although PGDH qualified for the 125 percent test under either Schedule, upon the Secretary's request to select the most appropriate Schedule, PGDH selected Schedule II. Consequently, on December 30, 1983, the Secretary granted PGDH's request for a waiver.
 
 
 21
 Although the grant of this waiver would have normally triggered the offset mechanism automatically, such was not the case for PGDH. At the time the Secretary granted PGDH's waiver, PGDH and HSCRC disputed whether the HSCRC rates applied to outside suppliers' charges for the technical component of ancillary services. Consequently, during this dispute PGDH never billed under Part A for these services and had, therefore, received no Part A payments for these services. J.A. at 137-39. Instead, only the outside suppliers received reimbursement under Part B for the technical component of ancillary services.
 
 
 22
 Because there was no double payment by Medicare for the technical component of ancillary services provided by outside suppliers, on July 3, 1984 and at the request of PGDH, the United States District Court for the District of Maryland enjoined the Secretary from using the amounts paid to the outside suppliers for these services under Part B to offset any other Part A payments to PGDH. The district court fashioned the injunction to expire automatically upon resolution of the dispute between PGDH and HSCRC.
 
 
 23
 Accordingly, in January 1985, after the decision of the Maryland Court of Appeals in Prince George's Doctor's Hospital, the district court's injunction automatically dissolved. Thereafter, PGDH received retroactive payments at the HSCRC rates under Part A for the technical component of ancillary services provided by outside suppliers since the inception of PGDH's waiver. Because this automatically created a double payment for these services, the Secretary imposed a retroactive offset equal to the amounts already paid to the outside suppliers under Part B for these same services.
 
 
 24
 Because PGDH's outside suppliers had submitted unitary billings to Medicare for Part B reimbursements, the Secretary had no information indicating the actual amounts which Medicare had already paid to outside suppliers for the technical component of ancillary services. Consequently, to determine these amounts, the Secretary applied the Schedule II percentages to the outside suppliers' unitary billings. Under the offset mechanism, the Secretary then used this figure to offset the total Part A payments to PGDH. Unfortunately, under this procedure the offset amount exceeded PGDH's Part A payments for the same services because the HSCRC rates, which controlled the amount of PGDH's Part A payments, were less than the amount of the technical component of the outside suppliers' bills as determined by the Schedule II percentages.[5]
 
 
 25
 In an effort to obtain an increase in its Part A reimbursements, PGDH challenged the Secretary's offset calculation before the PRRB. PGDH argued that the Secretary should have used the HSCRC rate at which PGDH was paid instead of the Schedule II percentages when determining the amounts which the outside suppliers billed under Part B for the technical component of ancillary services. The PRRB rejected PGDH's argument, causing PGDH to seek judicial review in the United States District Court for the District of Maryland. The district court affirmed the decision of the PRRB.
 
 
 26
 PGDH now appeals to this court.
 
 II
 
 27
 PGDH presents three primary arguments why the Secretary's actions should not withstand our scrutiny. Specifically, PGDH argues that: (1) once the Maryland Court of Appeals decided that the HSCRC rates applied to charges for the technical component of ancillary services provided by outside suppliers, the Secretary was required to use the HSCRC rates instead of the Schedule II percentages when determining the amount which the outside suppliers actually billed for these services (and therefore the amount of PGDH's offset); (2) the Secretary's refusal to use the HSCRC rates in determining PGDH's offset violated legislative intent because Congress intended the offset to equal, dollar-for-dollar, the amount of Part A payments to hospitals for the technical component of ancillary services provided by outside suppliers; and (3) the Secretary's refusal to adjust PGDH's offset to comply with the HSCRC rates amounted to arbitrary and capricious behavior in light of the Secretary's treatment of other hospitals. Because of our limited standard of review, we reject all three arguments.
 
 
 28
 * Under the Medicare Act, 42 U.S.C. § 1395oo(f), judicial review of the Secretary's statutory interpretations and factual findings is governed by principles established in the Administrative Procedure Act (APA), 5 U.S.C. § 500 et seq. Because the Medicare Act is "among the most intricate [Acts] ever drafted," Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981), APA principles of review require courts to give considerable deference to the Secretary's statutory interpretation unless that interpretation "is clearly contrary to the plain and sensible meaning of the [statute]." Hart v. McLucas, 535 F.2d 516, 520 (9th Cir. 1976). In addition, a court need only determine whether the Secretary's factual findings are supported by "substantial evidence." Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 487-88 (1951).
 
 
 29
 Thus, "the standard of review is narrow and this court will not substitute its judgment for that of the agency." Lloyd Noland Hosp. & Clinic v. Heckler, 762 F.2d 1561, 1565 (11th Cir. 1985) (citation omitted). Accordingly, a court's task "is the limited one of ensuring that the Secretary did not 'exceed his authority' and that [any] regulation is not arbitrary or capricious." Schweiker, 453 U.S. at 44 (quoting Batterson, 432 U.S. at 426). Moreover, a court"need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the [agency's] construction...." Chevron, U.S.A., Inc. v. Natural Resources Defense, 467 U.S. 837, 843 n.11 (1984) (citations omitted). Instead, this court must only "determine whether the [agency's] decision was based on a consideration of the relevant factors and whether there was a clear judgment error." Lloyd Noland Hosp., 762 F.2d at 1565.
 
 
 30
 Applying these principles to the present case, we are constrained to conclude that the Secretary's statutory interpretation must withstand scrutiny. Specifically, we believe that the Secretary followed the express terms of the offset provision and, therefore, did not ignore relevant factors or make a clear error in judgment.
 
 B
 
 31
 The plain wording of the offset provision required the Secretary to offset the Part A payments to PGDH by the amount which PGDH's outside suppliers billed Medicare under Part B for the technical component of ancillary services. Specifically, the offset provision of Section 602(k) provides that:
 
 
 32
 Any such waiver shall provide that such billing may continue to be made under Part B of such title but that the payments to such hospital under Part A of such title shall be reduced by the amount of the billings for such services under Part B of such title.
 
 
 33
 Pub. L. No. 98-21, 97 Stat. 65 § 602(k). Thus, Section 602(k) mandates clearly and unequivocally that before the Secretary could use the HSCRC rates to determine the amount of PGDH's offset, there had to be evidence that the outside suppliers actually billed at those rates.
 
 
 34
 In the present case, however, there is substantial evidence in the record to suggest that the outside suppliers never actually billed at the HSCRC rates for the technical component of ancillary services and that the HSCRC never enforced its rate regulations on outside suppliers' bills for these services. Specifically, an employee of the HSCRC testified that he had never seen any monitoring, enforcement, compliance action or control over outside suppliers by the HSCRC. This witness also testified that the HSCRC had no authority over outside suppliers, that no notice was ever given to outside suppliers regarding HSCRC's regulatory rates for the technical component of ancillary services, and that the information obtained from PGDH indicated that the outside suppliers' actual billings for these services exceeded the HSCRC rates.
 
 
 35
 Because the HSCRC rates did not accurately reflect the outside suppliers' actual billings for the technical component of ancillary services, the Secretary had to rely on other data to determine the appropriate amount by which to offset PGDH's Part A Medicare payments. The Schedule II percentages constituted the only data available to the Secretary to make this determination since PGDH's outside suppliers submitted unitary bills and PGDH presented no other evidence suggesting that its outside suppliers billed at rates different than the Schedule II percentages. Consequently, we think that the Secretary acted reasonably in using the Schedule II percentages to determine PGDH's offset.[6]
 
 C
 
 36
 We also believe that the Secretary did not act arbitrarily or capriciously by refusing to adjust PGDH's offset even though the Secretary adjusted the offset for other hospitals.[7] The Secretary's actions qualify as arbitrary and capricious if the Secretary"relies on factors that Congress did not intend for it to consider, entirely ignores important aspects of the problem, explains its decision in a manner contrary to the evidence before it, or reaches a decision that is so implausible that it cannot be ascribed to a difference in view." United States v. F/V Alice Amanda, No. 91-7555, slip op. at 13 (4th Cir. Feb. 26, 1993) (citations omitted). Accordingly, the Secretary "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n v. State Farm Mut., 463 U.S. 29, 43 (1983) (quotation omitted). In addition, a court should "uphold a decision of less than ideal clarity if the [Secretary's] path may be reasonably discerned." Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286 (1974).
 
 
 37
 In the present case, we think the Secretary provided a satisfactory explanation for the differential treatment between PGDH and the other hospitals. Specifically, the Secretary explained that he reduced the offset for other hospitals because, otherwise, the offsets for those hospitals would have included charges for services provided by outside suppliers for which those hospitals received nothing under their Part A payments. J.A. 199-202. In contrast, PGDH's Part A payments paid for the exact same services for which its outside suppliers received payment under Part B. Only the rate of payment for these services differed for PGDH and its outside suppliers. Consequently, PGDH's offset did not include charges for which PGDH received nothing under Part A. Because of this reasonable distinction between PGDH and the other hospitals, we believe the Secretary did not act arbitrarily or capriciously in refusing to adjust PGDH's offset.
 
 D
 
 38
 In summary, because the express terms of the offset statute require the Secretary to use the outside suppliers' actual billing rates and there is substantial evidence that PGDH's outside suppliers did not actually bill at the HSCRC rates, we believe that the Secretary did not ignore relevant factors or commit a clear error in judgment by refusing to adopt the HSCRC rates when calculating PGDH's offset. Lloyd Noland Hosp., 762 F.2d at 1565. In addition, we also believe that the Secretary's use of the Schedule II percentages to determine the outside suppliers' actual billing rates (and therefore PGDH's offset) was justified because the Secretary had no other information suggesting the actual billing rates by PGDH's outside suppliers. Finally, we believe the Secretary did not act arbitrarily or capriciously when it refused to adjust PGDH's offset even though the Secretary had previously adjusted the offsets for other hospitals because the Secretary provided a reasonable explanation for this differential treatment.
 
 III
 
 39
 For the reasons stated herein, we affirm the judgment of the district court.
 
 AFFIRMED
 
 
 [1]
 We shall refer to Prince George's Doctors' Hospital and its successor in interest collectively as "PGDH."
 
 
 [2]
 These third parties were commonly referred to as "outside suppliers."
 
 
 [3]
 The parties refer to this requirement as the "125 percent test."
 
 
 [4]
 The parties refer to bills which fail to separate the charges into the professional and technical components as "unitary bills."
 
 
 [5]
 To fully illustrate the effects of this procedure, we use the same example relied on by the district court. Suppose PGDH's outside supplier (a radiologist) submitted a unitary bill for $100 to Medicare for reimbursement under Part B, reflecting charges for both the professional and technical component of ancillary services provided. To determine the amount attributable to the charges for the technical component of ancillary services, the Secretary applied the appropriate Schedule II percentage (83.5 percent). Thus, the Secretary determined that $83.50 from the outside supplier's unitary bill constituted charges for the technical component. At the same time, PGDH billed Medicare under Part A for the same services; however, the HSCRC set the rate at which PGDH could bill Medicare for these services at $60.00. Consequently, the amount which PGDH received under Part A for the technical component of ancillary services provided by outside suppliers ($60.00) was less than PGDH's offset for these same services ($83.50). This discrepancy resulted in a net reduction to PGDH's Part A payments of $23.50. PGDH claims that this methodology inflicted an overall reduction of $1,579,647 to its Part A payments from Medicare
 
 
 [6]
 Nor is our decision incongruous with Congressional intent. Absent Maryland's demonstration project, the DRG formula would control the amount of Part A payments to a hospital operating under a waiver while the "reasonable charge" formula would control the Part B payments to outside suppliers. Because Congress created the DRG payment system to reduce Medicare payments to hospitals, such payments will usually be less than the amount which Part B's "reasonable charge" formula will pay outside suppliers for the same services. Since the offset provision requires the Secretary to offset a hospital's Part A payments by the Part B payments to outside suppliers for the same services, we believe that Congress recognized the possibility that a hospital's offset would not exactly equal its Part A payments
 
 
 [7]
 The Secretary adjusted the offset for: The Carle Foundation Hospital; St. Mary's Hospital; and Rochester Hospital